GENERAL LIFE INS. CO. v. COMMIS-
SIONER OF INTERNAL
REVENUE.
No. 10628.

Circuit Court of Appeals, Fifth Circuit.
July 8, 1943.

Robert Ash, of Washington, D. C., for petitioner.

Willard H. Pedrick, Sewall Key, and Samuel H. Levy, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and John W. Smith, Sp. Attorney, Bureau of Internal Revenue both of Washington, D. C., for respondent.

Gerald C. Mann, Atty. Gen., and Grover Sellers, both of Austin, Tex., for State of Texas as amicus curiae for petitioner.

Percy C. Fewell, of Dallas, Tex., amicus curiae for petitioner.

Before HUTCHESON, HOLMES, and WALLER, Circuit Judges.

WALLER, Circuit Judge.

The Tax Court held that petitioner was not a life insurance company within the purview of Sections 201(a) and 202(b) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Code, §§ 201(a), 202(b), and also that the petitioner was not taxable as a mutual insurance company under Section 207 of the Revenue Act of 1936, 26 U.S.C. A. Int.Rev.Code, § 207. We are asked to review that holding.

The taxpayer (petitioner) is a corporation under the laws of the State of Texas, writing policies for the payment of benefits in case of sickness, physical disability, accident, or death. The corporation was without capital stock and its articles of incorporation provided that it would be conducted for the benefit of its members and not for profit. Its principal business was the writing of life insurance policies in amounts not to exceed $1,000.00. It issued some combined life, health, and accident policies, but such policies constituted a small portion of the taxpayer's business. The company operated on the assessment plan and made stipulated assessments at regular intervals and had the right to make additional assessments if needed. The tax years involved are 1937, 1938, and 1939. In 1939 the Legislature of Texas enacted a statute [1] requiring assessments to be divided into at least two funds, one known as the Mortuary Fund, from which claims under policies or certificates were to be paid and to a limited extent the cost of defending contested claims. The other fund was the Expense Fund from which expenses were to be paid.

Prior to the enactment of the statute, and prior to the tax years in question, the Board of Insurance Commissioners of Texas had promulgated rules and regulations, under statutory authority, requiring each assessment company to adopt by-laws

---

[1] Section 12 of Article 5068—1, Vernon's Annotated Texas Civil Statutes.

providing that sixty per cent of all assessments received should be placed in a Mortuary Fund, which fund could be used only to pay policy claims and expenses incident to the defense, settlement, or payment of contested policy claims. The assessments for the first three months under a policy were to be considered as membership fees and not required to be placed in the Mortuary Fund. The taxpayer complied with the regulations of the Board of Insurance Commissioners, adopted the requisite by-laws, established the Mortuary Fund of sixty per cent of its assessment income, less the first three monthly assessments, and never made an additional assessment and had never failed to pay the face amount of any valid policy claim.

Under Texas law, the Board of Insurance Commissioners has full and complete supervision of assessment insurance companies. Associations of this character are required annually to secure from the Board certificates of authority to do business, and these certificates of authority can be issued only if the association: (1) files an annual statement that shows compliance with the law; (2) files, and has approved by the Board, by-laws that comply with the regulations; (3) files, and has approved, each policy form used; (4) furnishes evidence that it has on deposit in some bank or trust company a sum equal to the face value of the maximum loss insured in any individual policy. The by-laws of the taxpayer provide: "No part of the reserve or mortuary fund shall ever be used for the purpose of operating said company, but shall be used to pay policy obligations, as hereinafter provided." All operating expenses were charged to the Expense Fund. Membership fees (the first three monthly assessments), and forty per cent of all assessment income, were placed in the Expense Fund. The by-laws further provide that: "If the sum realized by the Company from such premiums or assessments shall be insufficient to pay its policy claims in full for which it is liable then the Company may call for additional premiums or assessments, and the payment of the full amount realized by the Company from said premiums less the amount deducted for expense as herein provided shall discharge the Company from all liability as to said claims, except that in no case shall payment be less than fifty per cent of the amount due under said policy contracts." It is further provided in said by-laws: "Section 3. Whenever,

from any cause, this Company shall have ceased to exist, all property shall be converted into cash, and all funds in hand or on deposit in bank, trust companies or safe deposit companies shall be divided pro rata among the then existing members of said company * * *."

The order of the Board of Insurance Commissioners of the State of Texas, adopted February 8, 1934, among other things provided:

"At least sixty percent (60%) of all other gross income of the association or company shall be placed in the Mortuary Fund. The remaining forty percent (40%) may be placed in the General or Expense Fund.

"The by-laws of such companies or associations may provide for the payment out of said Mortuary Fund of all attorneys' fees and necessary expenses arising out of the defense, settlement, or payment of contested claims."

Section 201(a), Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Code, § 201(a), provides:

"(a) Definition. When used in this chapter the term 'life insurance company' means an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident insurance), the reserve funds of which held for the fulfillment of such contracts comprise more than 50 percentum of its total reserve funds."

Section 202(b) of the Revenue Act of 1936, 26 U.S.C.A. § 202(b), is as follows: "(b) Reserve funds required by law, defined. The term 'reserve funds required by law' includes, in the case of assessment insurance, sums actually deposited by any company or association with State or Territorial officers pursuant to law as guaranty or reserve funds, and any funds maintained under the charter or articles of incorporation of the company or association exclusively for the payment of claims arising under certificates of membership or policies issued upon the assessment plan and not subject to any other use."

If the predominant business of petitioner was life insurance, and if it was maintaining the requisite reserve fund for the fulfillment of its contracts as defined in Section 201(a) supra, it would be entitled to be taxed as a regular "old line" life insurance company operating on a fixed-premium and appropriate legal reserve basis,

but being an assessment company doing a life insurance business, it was taxable under Sec. 202(b) identically as would a fixed-premium life insurance company, provided the reserve funds required by law were "actually deposited by any company or association with State or Territorial officers pursuant to law as guaranty or reserve funds", or provided a reserve fund was "maintained under the charter or articles of incorporation of the company or association exclusively for the payment of claims arising under certificates of membership or policies issued upon the assessment plan and not subject to any other use."

The taxpayer here is unquestionably issuing policies on the "assessment plan" and it is necessary that we first determine whether or not the taxpayer was, during the years in question, maintaining a reserve fund which was either, deposited with a state officer, or "maintained under the charter or articles of incorporation of the company exclusively for the payment of claims."

It is argued that the Company was required under Section 202(b) to actually deposit its reserve with State or Territorial officers pursuant to law, or that it must have maintained the reserve under provisions of its charter or articles of incorporation, for the exclusive payment of claims arising under policies, and that the taxpayer did not deposit its funds with any State officer, nor was there any provision in its charter or articles of incorporation which required the maintenance of any reserve. It is true that the funds were not deposited with a State officer nor was there any express provision in its articles of incorporation for the maintenance of such reserve. However, orders or regulations of the Board of Insurance Commissioners of the State of Texas, pursuant to authority of the statute, did, in 1934, require that sixty per cent of the assessment receipts be placed in a Mortuary Fund for the payment of claims arising under policies.

Postponing for the time the question as to whether or not the Mortuary Fund was a reserve fund as contemplated by the Federal Statute, we will first inquire whether or not the requirements of the Texas law, and regulations and orders made pursuant thereto, are a part and parcel of petitioner's charter, or articles of incorporation, so as to bring it within the requirements of Sec. 202(b).

There seems to be scant, if any, difference in the effectiveness of a reasonable regulation or order promulgated under the authority of a valid statute and the effectiveness of a statute embodying the contents of the regulation or order. Reasonable regulations or orders promulgated under statutory authority usually have the force and effect of law. It also seems well settled that pertinent parts of the law of the State of creation of a corporation are as much a part of the articles of incorporation, or charter, of a corporation organized under general law, as if the provisions of the law had been expressly written into the articles of incorporation.[2] Corporations are creatures of statute and are under the law and not above it.

---

[2] "The law is settled that the powers of a corporation organized under general laws are not determined alone from its charter provisions, but are also determined from the law under which it is organized or operates. It is also settled law that it is not necessary for the charter of a corporation to contain all the powers conferred by statute." State v. San Antonio Pub. Service Co., Tex. Com.App., 69 S.W.2d 38, 45.

"Corporations are the creatures of the law, and they can only exercise such powers as are granted [to them] by the law of their creation." North Side R. Co. v. Worthington, 88 Tex. 562, 569, 30 S.W. 1055, 1056, 53 Am.St.Rep. 778.

"Strictly speaking there is no charter where a corporation is created under a general law. However, the incorporation papers, whether called articles of incorporation, application for incorporation, certificate of incorporation, or any other term, together with the signature, seal or decree of approval, are often referred to as the charter, although as a matter of law, the so-called charter consists of such papers and the statutes under which the corporation is created. In other words, the provisions of the statute or general incorporation act enter into and form a part of the charter, and the incorporation papers and statute are to be construed together, the latter controlling in case of a conflict.

"It is not necessary that the general law should be copied in the charter, but it forms an essential part of it, and all parties are bound by its terms, whether copied in the charter or only found on the statute book. Moreover, constitutional provisions automatically become a part of the charter." Fletcher Cyclopedia Corporations, Vol. 1, p. 440, sec. 226.

■ It seems that if the law of the State is an integral part of the articles of incorporation of a corporation organized under the general law, then the requirements of the Texas law that the taxpayer adopt by-laws providing for a Mortuary Fund to be used exclusively for payment of claims arising under the policy, or for defense of the Mortuary Fund, are as much a part of the charter or articles of incorporation of the taxpayer as if the by-law in question had been written into the charter or articles of incorporation.

■ The Commissioner contends, however, that even if the Mortuary Fund of sixty per cent of the assessment income was maintained under the implied provision of the charter or articles of incorporation, nevertheless, Sections 201(a) and 202(b), require that the reserve fund must be actuarially, and not arbitrarily, computed, and that the Mortuary Fund is not a true insurance reserve fund. Treasury Department Regulation No. 94, Article 201(a)-1, undertakes to define reserve funds mentioned in the pertinent sections of the statute as follows:

"In general, the reserve contemplated is a sum of money, *variously computed* or *estimated,* which with accretions from interest, is set aside (reserved) as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims." (Emphasis added.)

\* \* \* \* \*

"Only reserves which are so required, which are peculiar to insurance companies, and which are dependent upon interest earnings for their maintenance will be considered."

The first portion of the above regulation is largely taken from the following statement in the opinion in the case of Maryland Casualty Co. v. United States, 251 U.S. 342, 40 S.Ct. 155, 158, 64 L.Ed. 297: "The term 'reserve' or 'reserves' has a special meaning in the law of insurance. While its scope varies under different laws, in general it means a sum of money, *variously computed* or *estimated,* which, with accretions from interest, is set aside—'reserved'—as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount or time of payment." (Emphasis added.)

If the regulation is inconsistent with the statute, the regulation should fall. There is nothing in the statute that refers to a reserve "actuarially computed", and we see nothing in the decision of the Supreme Court in the Maryland Casualty case, supra, that requires that the reserve be actuarially computed. The Court said that it meant a sum of money "variously computed or estimated". We take this to mean that it might be computed in various ways or that it might be estimated.

■ In that case the Court recognized that the scope of the term "reserve" varies in different states. Apparently the Court did not consider that the term "reserve" was an uniform one throughout the land. We know of no prohibition in the organic law that prevents the State of Texas from determining the amount of reserve necessary to fulfill contracts of insurance entered into by Texas companies. The fact that it is called a Mortuary Fund instead of a Reserve Fund is of no consequence, but it is important that the fund, by whatever name called, as required by the law of Texas, be held for the fulfillment of claims of depositors.

■ The Commissioner is not concerned with the adequacy or inadequacy of the reserve, but he is interested in its inviolability, and if it can be violated by the Company and used for its own purposes it should be treated as income of the Company. On the other hand, if it is irrevocably dedicated for the use and protection of the policy holders, it is not income of the Company.

An insurance company, as defined by Sections 201(a) and 202(b), is not taxed upon its premium receipts, but is taxed upon the "income received during the taxable year from interest, dividends, and rents." Section 202(a).

It is the universal concept that a life insurance company should maintain a reserve—not for its use but which it cannot invade—for the sole and exclusive protection of its policy holders. Since the reserve is held for the policy holders and not for the Company, Congress has not taxed this reserve as income to the Company. It is contemplated that the reserve is made up of money which the policy holder had put up for his own use and protection and not primarily for the use and protection of the Company. There is no apparent inequity in the policy of Congress in not planning to tax such reserve. However,

this reserve should be irrevocably dedicated to the payment of claims arising under the policies. In a sense, it partakes of the nature of an inchoate trust for the benefit of policy holders.

It would seem that if the Mortuary Fund here under consideration is exclusively and irrevocably dedicated to the use and benefit of the policy holders it should be within the purview of the established policy of Congress not to tax it as income to the insurance companies but as an investment-in-security by the policy holder.

It is hardly conceivable that the policy of Congress was to exempt, large, old line, fixed-premium life insurance companies, with its risks variedly spread over wide areas, and which had large reserves maintained by interest earnings, from taxation of premium income and to deny the benefit of the exemption to younger, smaller, and weaker life insurance companies, with their risks largely localized, and which had not yet built up a reserve sufficiently large for the investment income to maintain the reserve in the event of serious local epidemics or disasters. To so hold would be to attribute to Congress a misdirected discrimination in favor of the strong over the weak. To give effect to Treasury Department Regulation No. 94, as construed and applied by the Commissioner, would tend to deny the benefits of the exemption to the companies that needed it most. It is not thought that this was the intention of Congress.

The use of the quoted term "reserve funds required by law" in Section 202(b), if accorded any significance, suggests that Congress had in mind reserves required by law of assessment companies, as distinguished from reserves actuarially computed.

■ We hold that the statute does not require that the reserve be actuarially computed in order to make a life insurance company a life insurance company if its predominate business is life insurance, and if it, in fact, irrevocably maintains for the fulfillment of its life insurance contracts more than fifty per cent of its total reserve fund, when the reserve is fixed under the requirements of State law.

Having reached the foregoing conclusions, it is unnecessary to pass upon the thought-provoking brief of Mr. Fewell as amicus curiae.

The decision of the Tax Court is reversed and the deficiencies found against the taxpayer for the years 1937, 1938, and 1939, are set aside.

Reversed.

HOLMES, Circuit Judge (dissenting).

The taxpayer is not a life insurance company within the meaning of Section 201 of the Revenue Act of 1936. In order to qualify as a life insurance company under the statute, it is not enough that life insurance contracts are issued; it is essential that the company maintain reserve funds against such contracts. The Tax Court found that the taxpayer's mortuary fund was not actuarially computed according to recognized tables of mortality, and held that it was not taxable as a life insurance company. See: First Nat. Benefit Soc. v. Stuart, 9 Cir., 134 F.2d 438; National Protective Ins. Co. v. Commissioner, 8 Cir., 128 F.2d 948; Massachusetts Mut. Life Ins. Co. v. United States, 56 F.2d 897, 74 Ct.Cl. 162; Lamana-Panno-Fallo Industrial Ins. Co. v. Commissioner, 5 Cir., 127 F.2d 56.

The meaning of the words reserve funds, as used in the taxing statutes from 1909 to 1921, is given by the Supreme Court in Maryland Casualty Co. v. United States, 251 U.S. 342, at page 350, 40 S.Ct. 155 at page 158, 64 L.Ed. 297, as follows: "The term 'reserve' or 'reserves' has a special meaning in the law of insurance. While its scope varies under different laws, in general it means a sum of money, variously computed or estimated, which, with accretions from interest, is set aside—'reserved'—as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount or time of payment."

Other decisions indicating that the term as used in the statutes had a special and technical meaning are McCoach v. Insurance Co. of N. America, 244 U.S. 585, 37 S.Ct. 709, 61 L.Ed. 1333, and New York Life Ins. Co. v. Edwards, 271 U.S. 109, 46 S.Ct. 436, 70 L.Ed. 859. In addition, there is affirmative evidence that Congress intended the term, as it appears in Section 201(a) of the Revenue Act of 1936, to be given the technical meaning indicated by insurance technicians.[1]

---

[1] Mertens, Law of Federal Income Taxation (1942), Section 44.15, fn. 40: Senate Finance Committee Hearings on H.R. 8245 (Sept. 1-Oct. 1, 1921), pp. 87

I agree with the majority that the mortuary fund was required by law, but I think it was not a true reserve fund within the meaning of Section 201(a) of the Revenue Act of 1936, and it does not meet the test under Section 202(b) because it was not held exclusively for the payment of claims. Therefore, I think the judgment appealed from should be affirmed.

and 92, where it appears that members of the Committee objecting to phraseology of some of the proposed provisions were informed by Dr. T. S. Adams, Tax Adviser to the Treasury Department that:

"Only experts are interested * * * that language merely repeats the language of the present law, language which the companies themselves proposed and which they understand * * *. Every word of the phraseology of that section has been gone over by insurance experts of the very highest caliber. Only a few people are involved. The public is not interested in this, they do not have to read it, and the people who deal with it are experts. Every word of that phraseology was presented to the insurance officials, and only those companies who are involved must understand it."

That this may properly be considered in evaluating Section 201(a) is supported by the decision in National Protective Ins. Co. v. Commissioner, 8 Cir., 128 F. 2d 948, where the testimony of Adams before the Committee was relied on in part in resolving another problem of statutory construction.