**The Mutual Benefit Life Insurance Company, Petitioner *v.* Commissioner of Internal Revenue, Respondent**

Docket No. 3671–70. Filed July 27, 1972.

*Henry W. Connelly, Charles W. Kappes, Michael J. Walsh,* and *James A. Guadiana,* for the petitioner.

*Gerald Backer,* for the respondent.

QUEALY, *Judge:* The respondent determined deficiencies in petitioner's income taxes as follows:

| Year | Deficiency |
|------|------------|
| 1958 | $295,077.97 |
| 1959 | 296,495.14 |
| 1960 | 296,297.16 |

The sole question involved is whether an additional reserve established by the petitioner to supplement the basic policy reserve in meeting its obligations under the optional mode of settlement contract embodied in certain of its policies qualified during the years 1958, 1959, and 1960 as a life insurance reserve as defined in section 801(b).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

The Mutual Benefit Life Insurance Co. (hereinafter referred to as the petitioner) is, and was at all times material herein, a mutual life insurance company incorporated by act of the New Jersey Legislature on January 31, 1845.

The petitioner's principal place of business is now, and was at the time of filing its petition, located in Newark, N.J. The petitioner timely filed its Federal income tax returns for the taxable years ended December 31, 1958, December 31, 1959, and December 31, 1960, with the district director of internal revenue, Newark, N.J. Said tax returns were prepared on the basis of an accrual method of accounting.

The petitioner is subject to the provisions of the New Jersey State laws applicable to the operation of mutual life insurance companies and to the regulations promulgated pursuant to such laws by the State of New Jersey Department of Banking and Insurance.

Life insurance policies issued by the petitioner from 1908 through September 16, 1945 (hereinafter referred to collectively as the P-Policies) provided that the policyholder, prior to maturity of the policy, or the beneficiary, upon the maturity of the policy, might elect either (1) to leave the policy proceeds with the petitioner at interest; (2) payment of the proceeds in installments for a period certain (i.e., a guaranteed income for a minimum period regardless of the life of the beneficiary or beneficiaries); or (3) the payment of a specified amount for a period certain continuing for the life of the beneficiary or beneficiaries. The option with a life contingency, the third category described, is hereinafter referred to as the settlement option.

The payments to be made in the settlement options under the

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

P-Policies were embodied in a schedule setting forth the dollar amount of each installment payment for each $1,000 of insurance, in accordance with (a) a period certain; (b) the frequency of payment; (c) the age or ages of the beneficiary or beneficiaries; and (d) in certain policies, the sex of the beneficiary or beneficiaries. Under the terms of the P-Policies, the installments payable under the settlement options were guaranteed, and the petitioner was bound to pay such amounts.

From time to time, the petitioner changed both the policy forms used in issuing the P-Policies and the actuarial assumptions used in constructing the schedule for this settlement option, as follows:

(1) The payments under the settlement option contained in the policy forms adopted in 1908 were computed by the petitioner on the basis of interest at the rate of 3 percent per annum for the period certain and on the basis of McClintock's Mortality Table—Females and interest at the rate of 3½ percent per annum for the deferred life period following the period certain.

(2) The payments under the settlement option contained in the policy forms adopted in 1922 were computed by the petitioner on the basis of the American Experience Table of Mortality and interest at the rate of 3 percent per annum.

(3) In 1932, the petitioner adopted a retirement endowment policy form which introduced a joint and survivor settlement option. The payments under this joint and survivor settlement option were computed by the petitioner on the basis of interest at the rate of 3 percent per annum for the period certain and on the basis of the American Annuitants' Table, adjusted by rating down 1 year in age for males and 5 years in age for females and by using only the ultimate portion thereof, and interest at the rate of 3½ percent per annum for the deferred life period.

(4) In 1936, the petitioner adopted a retirement endowment policy form which contained settlement options for use in insuring females. The payments under this settlement option were computed by the petitioner on the basis of the American Annuitants' Table for male lives, adjusted by rating down 1 year in age for males and 5 years in age for females, and interest at the rate of 3 percent per annum.

(5) In 1938, new policy forms were adopted by the petitioner for all plans of insurance. These forms contain settlement options, the payments under which were computed by the petitioner on the basis of interest at the rate of 3 percent per annum for the period certain and for the deferred life period on the basis of the American Annuitants' Table for male lives, adjusted by rating down 3 years in age for males and 7 years in age for females and by using only the ultimate portion thereof, and interest at the rate of 3½ percent per annum.

Following the issuance of the P-Policies, there was a substantial lengthening of the life expectancy at all ages and a corresponding decrease in the rate of mortality. As a result, it became apparent that the lump-sum payment otherwise due on a policy, which was reflected in the reserve, would be inadequate to fund the petitioner's liability in the event that the insured or the beneficiary elected the settlement option.

The decrease in the rate of mortality also resulted in the realization of additional income to the petitioner from these same policies by reason of the fact that petitioner was receiving premiums for a greater number of years and in an amount in excess of the amount required to make payment of death claims under the policies. However, the excess in premiums received during the life of the policy was either distributed to the policyholder in the form of dividends or became a part of the surplus.

As a result of the foregoing, when a beneficiary elected the optional settlement under the P-Policies, the amount provided to pay death benefits was less than the amount that was required as a reserve for the annuity payments. This difference the petitioner denominated as "strain." The strain experienced by the petitioner upon an election differed depending upon the age and sex of the beneficiary.

Prior to the year ending December 31, 1946, the petitioner determined the actual strain at the time that the election of the settlement option became effective. At that time, the difference between the policy reserve and the amount required to fund the settlement option was charged against current surplus. Such a charge reduced the amount of current income available to the policyholders. As a result, the additional cost required to fund the settlement option served to increase the net premium cost of the remaining policyholders.

In the year 1946, the legislature of the State of New Jersey enacted a bill, appearing as section 17:34–22.1 of the New Jersey Statutes Annotated, as follows:

Sec. 17: 34–22.1    Additional reserves

Subject to the approval of the commissioner, any life insurance company of this State may set up, in addition to the reserve liabilities required pursuant to section 17: 34–22 of the Revised Statutes, reserves to provide for any additional liability at maturity, on the basis of rates of interest and of mortality appropriate to the valuation of annuities, on policies under which by their terms or otherwise a right has been or may be exercised to elect optional modes of settlement.

The commissioner shall, at the time of the annual valuation pursuant to section 17: 34–22 of the Revised Statutes, make or cause to be made a valuation of the additional reserves so set up, and shall thereupon include the amount of such additional reserves in any certification of reserves made pursuant to section

17: 34–22 of the Revised Statutes, specifying the mortality table or tables and rate or rates of interest used in the calculation of such additional reserves.

The basis of such additional reserves set aside by any company at the close of any year shall not thereafter be changed to a basis producing smaller aggregate reserves except upon approval by the commissioner of the company's application therefor. * * *

Following the enactment of section 17:34–22.1 of the New Jersey Statutes, the petitioner set about to establish, as of December 31, 1946, an additional reserve to provide for the settlement options contained in the P-Policies not yet matured (hereinafter referred to as the additional reserve). In computing the additional reserve, the petitioner adopted the 1937 Standard Annuity Mortality Table, adjusted by rating down 1 year in age, and an assumed rate of interest of 2¾ percent in the manner described below.

In the application of this table, however, it was necessary also to determine with respect to the P-Policies (a) the projected rate of election of settlement options; (b) the age and sex of beneficiaries; (c) the amount of the policy proceeds which become subject to election; and (d) the future date on which such election would become effective.

In determining the amount which would be required as an additional reserve for the P-Policies, the petitioner first assumed that its additional liability, or strain, would remain at a constant percentage of policy proceeds arising from all death claims and endowment maturities under the P-Policies. This percentage was obtained by dividing the additional amounts needed in past years to provide for such additional liability on the basis of the 1937 Standard Annuity Mortality Table, adjusted, and an assumed rate of interest of 2¾ percent, by the policy proceeds arising from all death claims and endowment maturities for such past years.

The additional reserve requirements determined by the petitioner as of December 31, 1946, was thus based on the assumption that the actual strain which petitioner had experienced in the year 1945, as compared to the death proceeds paid in that year, would be in the same proportion in each succeeding year for the duration of the P-Policies. The strain thus computed was discounted at 3 percent per annum, which resulted in the estimate that approximately $37 million would be required for the additional reserve to fund the optional settlement costs as of December 31, 1946. Due to the fact that the charge of the full amount to surplus in that year would result in a corresponding reduction in the dividends payable to its policyholders, the petitioner elected not to set up the full amount of its estimate. In lieu thereof, lesser amounts were set up each year thereafter until the year ending December 31, 1953, when the additional reserve amounted to approximately $21,404,000. This amount remained fairly constant thereafter.

As of December 31, 1956, the additional reserve amounted to approximately $21,200,000.

In computing the additional reserve which would be required as of January 1, 1957, the petitioner took into account its experience for the years 1952 through 1956, both inclusive. It determined the strain (additional liability) ratios for each such year by dividing the aggregate of initial reserves established on the basis of the 1937 Standard Annuity Mortality Table, adjusted, and an assumed rate of interest of 2¾ percent, less proceeds applied pursuant to settlement option elections, by the total proceeds maturing as death claims and endowments in each of these past years. The resulting strain as determined by petitioner was, as follows:

| Year | Ratio |
|------|-------|
| 1952 | 0. 02284 |
| 1953 | . 02754 |
| 1954 | . 02647 |
| 1955 | . 02217 |
| 1956 | . 01972 |

The proceeds under the P-Policies amounted to approximately $200 million with an average policy size of $9,000 to $10,000, so that the number of P-Policies subject to settlement option elections was approximately 20,000 policies. The average strain ratio for this 5-year period was 0.02375.

The 1952–56 average strain of 0.02375 was then applied to the expected death claims and endowment maturities for each year beginning with 1957 and ending with 2031 (the year in which it was expected that the youngest P-Policyholder would reach age 96). Future death claims and endowment maturities were obtained by the use of the petitioner's mortality experience for 1952 through 1956 and a lapse rate of 1.75 percent which was also arrived at on the basis of the petitioner's experience.

Upon the basis of these calculations, the petitioner determined the amounts which would be required to meet the strain for the years 1957 through 2031. These amounts were then discounted to January 1, 1957, on the basis of an assumed rate of interest of 3 percent. In accordance with this procedure, the additional reserve required as of January 1, 1957, was determined to be $18,586,369. [2]

Using the same method of computation for the years 1957, 1958,

---

[2] This sum was $2,668,160 less than would have been required on the basis of the computation of the additional reserve originally made in 1946. The original computation made in 1946 followed the same methodology as the aforesaid 1957 calculation except that the 1941 Basic C.S.O. Table was used with respect to the life expectancies of the underlying insured persons instead of the petitioner's 1952–56 mortality experience.

1959, and 1960, inclusive, the projected strain and actual strain were, as follows:

| Year | Projected strain | Actual strain |
|---|---|---|
| 1957 | $1,015,729 | $999,065 |
| 1958 | 1,055,444 | 907,217 |
| 1959 | 1,077,265 | 916,560 |
| 1960 | 1,093,449 | 841,529 |

Since the actual strain for 1957 and 1958 approximated the projected strain under the 1957 computation, the petitioner, with the consent of the New Jersey commissioner of banking and insurance, computed the additional reserve at December 31, 1957, 1958, 1959, and 1960 by increasing it by an assumed interest rate of 3 percent and reducing it by the actual strain for each year. The petitioner proposed "to continue this practice in the future until developments indicate that this course is not appropriate."

The amount of the additional reserve at January 1, 1958, 1959, and 1960, and December 31, 1958, 1959, and 1960, and the mean for the years 1958, 1959, and 1960, were as follows:

| | January 1 | December 31 | Mean of year |
|---|---|---|---|
| 1958 | $18,129,909 | $17,752,981 | $17,941,445.00 |
| 1959 | 17,752,981 | 17,355,262 | 17,554,121.50 |
| 1960 | 17,355,262 | 17,021,768 | 17,188,515.00 |

The 3-percent interest addition to the reserve in each of the years 1958, 1959, and 1960 was $530,289, $518,841, and $508,035, respectively.

By reason of the fact that in each of the years 1958, 1959, and 1960, the additional reserve was computed by subtracting the actual strain from the opening balances in each year (as above described) petitioner necessarily reported no underwriting income from the annual reductions to the reserve.[3]

The additional liability of the petitioner under the settlement options contained in the P-Policies could not be provided for by means of the basic policy reserve held under section 17:34-22 of the New Jersey Statutes, nor by way of a change in the mortality or interest assumptions used in the calculation thereof.

At the time the gross premiums charged for the P-Policies were computed, it was assumed that the policy proceeds alone would fully fund the settlement options contained therein. Therefore, no portion of the premium was specifically or separately charged for the inclusion of the settlement options. The petitioner paid dividends on all of the P-Policies which were participating policies in each and every year.

---

[3] In adopting this method of accounting, the petitioner achieved the same result that was provided for by the exclusion in sec. 801(b)(4) of deficiency reserves. H. Rept. No. 34, 86th Cong., 1st Sess., p. 18, 1959-2 C.B. 748.

Beginning in 1948 and continuing through 1962, these P-Policy dividends were reduced because of dividend charges made in order to restore the amounts which were previously transferred from surplus to the additional reserve. Accordingly, the establishment of the additional reserve enabled the petitioner to assess the cost of the additional liability under the settlement options against the P-Policyholders.

During the years in issue, the petitioner held deficiency reserves required by the laws of the State of New Jersey with respect to certain life insurance and annuity policies. None of these deficiency reserves included the additional reserve or were related to the settlement options contained in the P-Policies.

Petitioner is a mutual life insurance company organized under the laws of the State of New Jersey. Life insurance policies written by the petitioner provided for an election to receive the proceeds in installments payable for a period certain and continuing for the life of the beneficiary. At the time the policies were written, the amounts thus payable were determined by reference to the then current mortality tables and an interest factor predicated upon the estimated rate of return which would be realized by petitioner from the investment of its reserves.

During the intervening years between the writing of such policies and the occurrence of the insurable event, that is the death of the insured, there was a substantial increase in life expectancy at all age levels. In other words, both the insured and the beneficiaries of such policies were living on the average many years longer than the anticipated life expectancy which was used as a basis for fixing the premiums in the policies and the installments payable to the beneficiaries in the event of the election of the optional settlement. The basic policy reserve, which was predicated on the payment of a sum certain upon the death of the insured, was inadequate to fund the life annuity of those beneficiaries who were entitled to receive a specified amount in installments payable for a period certain and continuing for their respective lives. This inadequacy was termed "strain" by the petitioner.

Prior to the years ending December 31, 1946, the amount of strain which was experienced on account of the election of the optional settlement was determined as of the date of death of the insured and the resulting deficiency served to reduce surplus. In other words, the strain became a current charge to operations at the time the election took effect and an annuity reserve was set up to provide for the payments thereunder.

During the year 1946, the legislature of the State of New Jersey enacted section 17:34–22.1 of the New Jersey Statutes which permitted, *but did not require*, the maintenance of an additional reserve to provide for any additional liability at maturity on the basis of rates of interest and of mortality appropriate to the valuation of annuities on account of life insurance policies which granted the right to elect optional modes of settlement. The statute further provided that the basis of such additional reserve shall not thereafter be changed to a basis producing smaller aggregate reserves except upon approval by the New Jersey commissioner of banking and insurance.

Prior to the years involved in this case, the petitioner had duly elected to establish an additional reserve on a basis which had been approved by the New Jersey commissioner of banking and insurance. Thus, over a period of years, an appropriate reserve had been set up voluntarily by the petitioner and upon a basis largely of petitioner's own choice. Having established such a reserve, the sole question for decision is whether the reserve qualifies as a "life insurance reserve" within the meaning of section 801(b), thereby entitling the petitioner to the exclusion provided in section 804(a). Insofar as material herein, section 801(b) provides as follows:

(b) LIFE INSURANCE RESERVES DEFINED.—

(1) IN GENERAL.—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

(2) RESERVES MUST BE REQUIRED BY LAW.—Except—

(A) in the case of policies covering life, health, and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation, and

(B) * * *

in addition to the requirements set forth in paragraph (1), life insurance reserves must be required by law.

At the outset, respondent argues that in enacting the Life Insurance Income Tax Act of 1959 it was the intent of Congress to tax alike all life insurance companies. The respondent contends that allowing the petitioner to set up a life insurance reserve for the anticipated strain would result in a tax advantage to the petitioner in relation to other life insurance companies not having such reserves. Since any decision with respect to the qualification of a reserve for the purpose of funding the annuity option in life insurance contracts would apply

to all life insurance companies having such contracts, we regard repondent's argument wholly irrelevant to the issue in this case. The tax laws are replete with so-called tax preferences for those who qualify.

The respondent also contends that the additional reserve does not qualify as a life insurance reserve because it was not "computed or estimated on the basis of recognized mortality or morbidity tables" as required under section 801(b). Respondent argues that in the instant case there was involved the added element of uncertainty stemming from the election with respect to the settlement options and the uncertainty with respect to the age and sex of those electing in the future. Admittedly, however, it was the change in mortality rates predicated upon recognized tables that resulted in the inadequacy of the initial reserve to fund the settlement option. The determination of the amount required to fund the annuity at any specific age could be arrived at solely by reference to mortality tables and assumed rates of interest. Admittedly, it was also necessary to include in any computation of the reserve an assumed ratio of selection and the weighted average age or life expectancy of the beneficiary at the time of making the choice. Thus, while recognized mortality tables formed the basis of the petitioner's calculations of the reserve, the rate of selection and the profile of the annuitant had to be determined upon the basis of experience.

Respondent does not suggest that some other method would produce a different result. Rather, the respondent argues that the method itself goes beyond the use of recognized mortality tables. If such judgments were not an integral part in the computation of insurance reserves, we would hardly have need for actuaries. The so-called actuary would still be known as the mathematician.[4] In our opinion, the combination of mortality tables and actual experience used by the petitioner to determine in the first instance the amount required to fund its liability for the settlement option under the P-Policies was within the scope of the statute.[5]

The respondent also points out that having determined the amount of the reserve which would be required, petitioner did not in a single year set up a reserve for the full amount that was thus determined. Charging the full amount to the reserve in one year out of its surplus would have made a corresponding reduction in dividends payable on account of its policies. Petitioner concluded that such reduction would be excessive. Assuming that a charge of the full amount to reserve in

---

[4] When petitioner was incorporated in 1845, its charter provided that there be a "mathematician," and petitioner's chief actuary is still known by that title.

[5] The reference to "recognized mortality or morbidity tables" first appeared in the Revenue Act of 1942. It was intended to expand, not to restrict, the definition of life insurance reserves. S. Rept. No. 1631, 77th Cong., 2d Sess., p. 145, 1942-2 C.B. 612.

one year would have qualified as a life insurance reserve, the election by the petitioner to set up a lesser amount in each year over a period of years would not make the amount thus set aside any less qualified. *Lamana-Panno-Fallo I. Ins. Co.* v. *Commissioner*, 127 F. 2d 56 (C.A. 5, 1942).

Finally, we think it is clear that the reserve required to fund the optional settlement cannot be distinguished from the obligation of the petitioner to pay a death benefit under a life insurance contract. Depending upon changes both with respect to mortality rates and interest yields, the basic reserve under the contract could have been either greater or lesser than the amount required to meet petitioner's obligations under the optional settlement clause. Any additional reserve designed to provide for a deficiency in the basic reserve constitutes a reserve for the purpose of meeting the anticipated future obligation to pay benefits under a life insurance contract. The fact that such benefits may be payable in the form of an annuity, rather than a lump sum, does not change the character of contract.

We thus come to the basic question in this case, namely, whether it can be said that the additional reserve was "required by law" within the meaning of section 801(b)(2). The respondent contends that, since section 17:34–22.1 of the New Jersey Statutes provided in the first instance for a reserve that was discretionary or permissive, it was not required by law. On the other hand, the petitioner contends that the additional reserve was required by law since, once established, such reserve could not be diminished without the approval of the commissioner of insurance for the State of New Jersey.

On its face, the phrase "required by law" would appear to exclude a reserve which in the first instance was permissive rather than mandatory. In the taxation of the life insurance industry, however, we must look beyond the ordinary meaning of the words in the statute. *Alinco Life Insurance Co.* v. *United States*, 373 F. 2d 336, 352–353 (Ct. Cl. 1967).

Except for the reference to "recognized mortality or morbidity tables" the definition of life insurance reserves in section 801(b) was a codification of the respondent's regulations antedating the Revenue Act of 1942. S. Rept. No. 1631, *supra*. As used in those regulations, the phase "required by law" referred not only to duly enacted State laws but to rules and regulations promulgated by duly authorized State regulatory agencies.[6] Section 1.801–5(b), Income Tax Regs., defines "required by law" as follows:

(b) *Reserves required by law defined.* For purposes of part I, subchapter L, chapter 1 of the Code, the term "reserves required by law" means reserves which

---

[6] Regs. 103, sec. 19.203(a)(2)–1.

are required either by express statutory provisions or by rules and regulations of the insurance department of a State, Territory, or the District of Columbia when promulgated in the exercise of a power conferred by statute, and which are reported in the annual statement of the company and accepted by state regulatory authorities as held for the fulfillment of the claims of policyholders or beneficiaries.

Section 17: 34–22.1 of the New Jersey Statutes not only permitted the setting up of a reserve for a recognized risk, but further provided that:

The basis of such additional reserves set aside by any company at the close of any year shall not thereafter be changed to a basis producing smaller aggregate reserves except upon approval by the commissioner of the company's application therefor. * * *

It cannot seriously be argued that the additional reserve voluntarily set up by the petitioner prior to the years before the Court was not required to be maintained by virtue of the regulatory powers specifically granted to the State commissioner of banking and insurance. In the taxable years under consideration, therefore, there was on the books of the petitioner a reserve established in prior years pursuant to State law which had achieved the status of a reserve required to be maintained under the regulatory authority of the State agency. If we look to the respondent's regulations, this is tantamount to being "required by law" within the meaning of section 801(b).

As of January 1, 1958, the petitioner's additional reserve was "required" to be maintained by the commissioner of banking and insurance and was reported in the annual statements of the petitioner and accepted by the commissioner as held for the fulfillment of claims. It is our conclusion, therefore, that the additional reserve qualified as a life insurance reserve within the meaning of section 801(b).

In reaching this conclusion, it is not our intention to approve the manner in which the petitioner accounted for this reserve during the years in question. It would appear that the petitioner sought thereby to achieve the same result that was provided for by the Congress in excluding deficiency reserves from the overall computation of life insurance reserves. If it was necessary specifically so to exclude deficiency reserves under section 801(b)(4), it would seem to follow that proper credits and debits to other life insurance reserves not specifically so excluded should be taken into account in determining the tax base. However, the election of the petitioner to adjust the reserve on account of an assumed interest rate of 3 percent and reduce it by the actual strain for each year does not disqualify the reserve under section 801(b).

Reviewed by the Court.

*Decision will be entered under Rule 50.*