The **MUTUAL BENEFIT LIFE INSURANCE COMPANY,** (James P. Moore, Jr., Vice President and Comptroller), Appellee,

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 73–1169.

United States Court of Appeals, Third Circuit.

Argued Sept. 25, 1973.

Decided Dec. 12, 1973.

As Amended Jan. 8, 1974.

Henry W. Connelly, Shearman & Sterling, New York City, for appellee; Charles W. Kappes, Senior Vice President and Gen. Counsel, Newark, N. J., Michael J. Walsh, Shearman & Sterling, New York City, of counsel.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Ernest J. Brown, Acting Chief, App. Section, Tax Div., Dept. of Justice, Washington, D. C., for appellant.

Before SEITZ, Chief Judge and HUNTER and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

While there are many who complain that the Internal Revenue Code is incomprehensible, there are some few who revel in the intricacies of its labyrinthine composition. But those who take delight in such pursuits and who also understand the mystic processes of es-

tablishing reserves in the life insurance industry are an even rarer specie of the ornithological world. Such are the vagaries of assignments, however, that it has fallen to the lot of this panel to decide a case where the two sciences conjoin. We therefore tread into the thicket with some trepidation.[1]

The immediate question before us is whether the Tax Court properly decided that amounts allocated by the petitioner Insurance Company to an "additional reserve" qualify as "life insurance reserves" under Section 801 of the Internal Revenue Code of 1954 and the Life Insurance Company Tax Act of 1959, 26 U.S.C. § 801.

The problem is complicated by the fact that in the life insurance industry, as in many others, words acquire a technical significance, and the first step to confusion is to read these special terms as if they mean what they seem to mean. Thus, at the very outset it is appropriate to note that contrary to generally held belief, "reserves" are not trust funds or assets in escrow but factually are merely statements of liability, involving no representation that specific assets are held to meet any particular claim or class of claims.[2] We are concerned here, therefore, with the computations of an amount which is to be entered on the balance sheet of an insurance company as a liability and, thus, has significant tax consequences.

The dispute here has its origin in a real life situation, to be exact, the substantial lenghtening of life which occurred during the first half of the twentieth century.

Beginning in 1908 and continuing through 1945, the Insurance Company sold a series of life policies (called P–

Policies) which gave the beneficiary the privilege of electing one of several methods of settlement in lieu of the customary face value lump sum payment. The option of concern here gives the beneficiary the right to receive payments for the rest of his life, but in no event for less than a stated number of these installments. The amount of each payment (which varies with the age of the beneficiary) is fixed and set forth in tables printed in the policy.

The tables were prepared on the assumption that the lump sum payment and the installment option would be roughly equivalent in value so that the liability of the Company in either event would be the same. However, as time went on and the lives of beneficiaries lengthened, it became obvious that the liability of the Company to meet the annuity-type option was becoming substantially greater than the lump sum payment. This situation developed because the amount of each monthly payment was fixed by the tables in the original policies based on life expectancies which were prevalent at that time. Since the beneficiaries began to live longer than the Company had anticipated at the time it wrote the contract, more payments were required and, hence, a greater total expenditure became necessary.

The petitioner had its headquarters in New Jersey, and that state's insurance laws required the Company to enter on its books annually a "basic reserve" which represented the amount that would be needed to meet the obligation to pay the face amounts of policies which became collectible that year. So long as the costs of lump sum payments and the time payment option were about the

---

1. No less an authority than Learned Hand once said, "In my own case the words of such an act as the Income Tax, for 'example, merely dance before my eyes in a meaningless procession: cross-reference to cross-reference, exception upon exception—couched in abstract terms that offer no handle to seize hold of—leave my mind only a confused sense of something vitally important, but successfully concealed, purport, which it is my duty to extract, but which is within my power, if at all, only after the most inordinate expenditure of time." Hand, Eulogy of Thomas Walter Swan, 57 Yale L.J. 167, 169 (1947).

2. Knickerbocker, The Present Status of Life Insurance Reserves, 23 Tax Lawyer, Winter 1970, 367, 374 n. 22. 8 Mertens, Law of Federal Taxation, § 44.26 n. 1.

same, the accounting procedure was satisfactory and accurately reflected the Company's liabilities. When, however, the increasing longevity of beneficiaries required payment of sums beyond the amount of the basic reserves, an accounting problem was created.

The difference in amounts between the "basic reserve" and that required to settle under the settlement option was called "strain." Before 1946, the Company took the amount of "strain" from current surplus at the time that a beneficiary elected to receive the payment option. The problem became increasingly acute, and in 1946 the Legislature of New Jersey enacted a statute (N.J.Stat. Ann. § 17:34–22.1) permitting an insurance company to set up "additional reserves" to meet the anticipated "strain" situation in future years.[3]

The statute provided that the establishment of such reserves initially would be voluntary but that once a company had availed itself of the privilege, reserves could not be changed to a basis producing smaller amounts thereafter except with approval of the insurance commissioner.

The Company decided to avail itself of the statutory provision and computed an "additional reserve" by using:

(1) The 1941 C.S.O. Mortality Tables,[4]

(2) The 1937 Standard Annuity Mortality Table, adjusted by rating down 1 year in age,

(3) An assumed rate of interest of $2\frac{3}{4}\%$ and additionally:

(a) Projected rate of election of the settlement option,

(b) Age and sex of beneficiaries,

(c) Amount of policy proceeds which would become subject to election, and

(d) The future date on which the election would become effective.

In computing the additional reserve requirements which would be required as of December 31, 1946, the Company assumed that the "strain" experienced in previous years, as compared to the lump sum death claims and endowment benefits paid, would remain at a constant ratio during the remaining years in which the P–Policies would be in effect, that is, to the year 2031. Rather than debit this amount in one year—which would have had a strong, adverse effect on the Company surplus and reduce the dividends to policyholders—it was decided to strengthen the reserves over a period of years until the desired level was achieved. The computations and procedures followed by the Company were approved by the Insurance Commissioner of New Jersey.

As of December 31, 1956, the "additional reserve" amounted to $21,254,529.-00. It was then decided to recalculate this reserve by utilizing the Company's experience during the preceding five years, that is, 1952 to 1956 inclusive. This resulted in a reduction for 1957 to $18,586,369.00.

In computing the "additional reserve" in 1956, the Company followed basically the same formula except that in this later calcuation the mortality experience of the Company during the years 1952–1956 was used to determine the life expectancy of the *insured person* instead of the 1941 mortality table which was

---

3. Because of the requirements of state law that reserves for the lump sum payment, the "basic reserve", be calculated on a rigid formula which made no provision for meeting the annuity-type option, it was not possible to increase that reserve to meet the "strain." Thus, although the Company took in more than enough in premiums to meet the "strain" obligation, the structure of state regulation required that the amount of premiums in excess of that required to

maintain the "basic reserve" be transferred to surplus or returned to the policyholder in the form of dividends. Generally the Company returned the excess amounts to the policyholder as dividends.

4. C.S.O. is the abbreviation for Commissioner's Standard Ordinary Table. It was based on the experience of a group of the principal insurance companies from 1930 to 1940. *See*, MacLean, Life Insurance, 9th ed. 1962 at 72.

used in the 1946 calculation.[5] Both calculations, however, relied upon the use of the 1937 Standard Annuity Mortality Table in estimating the life of the *beneficiary* under the settlement option.

The 1957 calculations were approved by the New Jersey Insurance Commissioner and resulted, as has been seen, in a reduction in the amount of the "additional reserve" from that which would have been applicable under the original calculation.[6] Similar mechanics were followed in determining the "additional reserve" for 1958, 1959, and 1960. The "additional reserves" as of December 31 for those respective years were $17,752,981.00; $17,355,262.00; and $17,021,768.00, respectively.[7]

The Commissioner assessed a deficiency for each of those years. After a trial, the Tax Court found against the Commissioner and determined that no deficiencies existed.[8]

The Commissioner contends that the "additional reserves" do not qualify as life insurance reserves under the Act because:

(1) Section 801(b)(2) requires that the establishment of the reserves be "required by law" and since the Insurance Company voluntarily established the reserve initially, that qualification was not met.

(2) The Act, Section 801(b)(1)(A) defines a reserve as one computed on the bases of mortality tables and an assumed rate of interest.

Therefore, since the calculations here used additional factors, such as lapse rate, rate of election, and company experience, the Commissioner contends that the reserve lost its eligibility to be considered as a life insurance reserve.

(3) The Code excludes "deficiency reserves," and its definition would include the "additional reserve" here.

We first consider the qualification that the reserve be required by law. The income tax regulations, Section 1.-801–5(b), define "required by law" as follows:

"For purposes of part I, subchapter L, chapter 1 of the Code, the term 'reserves required by law' means reserves which are required either by express statutory provisions or by rules and regulations of the insurance department of a State, Territory, or the District of Columbia when promulgated in the exercise of a power conferred by statute, and which are reported in the annual statement of the company and accepted by state regulatory authorities as held for the fulfillment of the claims of policyholders or beneficiaries."

The New Jersey statute applicable, that is, Section 17:34–22.1, permitted the setting up of an additional reserve but imposed the restriction that "The basis of such additional reserves set aside by any company at the close of any

---

5. Findings of Fact of the Tax Court, n. 2.

6. This circumstance would result in a lesser exclusion, and hence the change in the Insurance Company's reserves would not adversely affect the government. Ordinarily one would not expect the Commissioner to object to such action. However, his attack here is to refuse recognition to the reserve in its entirety, claiming that the additional factors which were used to reduce the reserve destroyed its eligibility for inclusion altogether.

7. The basic 1956 calculation was utilized in determining the 1958, 1959, and 1960 reserves. This was done by a method of increasing the reserve by 3% per year (the

same yearly percentage which had been used in discounting the amount originally projected for the whole period of the P-Policy) and then deducting the actual "strain" incurred during each year. We are not called upon to pass on this particular accounting procedure since we are concerned in this appeal only with the determination of whether the reserves are properly denominated as insurance reserves.

8. A more detailed statement of the facts and the mathematical computations involved may be found in the opinion of the Tax Court, 58 T.C. 679, filed July 27, 1972. We have limited our recitation of the factual background to that necessary for an understanding of the legal issues.

year shall not thereafter be changed to a basis producing smaller aggregate reserves except upon approval by the commissioner of the company's application therefor . . . ."

Thus, while the initial decision to set up a reserve was entirely voluntary, its continuance was not. What the Company did in 1946 was of its own choosing, but in 1958 to 1960 it was not free to drop the reserve or to alter its formulation without having specific permission from the Insurance Commissioner.[9] To argue that the Company was not required to carry the reserve in the years in question is to ignore reality. A man who volunteers for the Armed Forces is as subject to its discipline and regulations thereafter as any other person in service. His voluntary act in enlisting does not give him the right thereafter to question the lawful exercise of authority by his superiors. A man may enter into a marriage voluntarily, but that is not a reason to limit his obligation imposed by law to support his family. Similarly here, the Company could elect to take action permitted by the New Jersey statute, but when it did take that step, it did submit itself to the requirement that the reserve be continued thereafter. A fair reading of the income tax regulation requires us to conclude that in 1958–1960, the reserve was "required by law."

■ Next we consider whether the "additional reserve" was a "life insurance reserve" within the meaning of the Code. It seems clear that the establishment of the "additional reserve" was the exercise of good business judgment, was in the best interest of policyholders and beneficiaries, and had the approval of the State of New Jersey. Admittedly, however, these factors are not determinative when definitions under the tax laws of the United States are involved.

Taxation of insurance companies has always involved some specific treatment by Congress in recognition of the peculiar nature of the industry. Thus, it has been acknowledged that part of the money taken in by the Company as premiums and part of the money earned on investments really belong to the policyholders. United States v. Atlas Life Insurance Co., 381 U.S. 233, 247, 85 S.Ct. 1379, 14 L. Ed.2d 358 (1965). Accordingly, it became necessary to make provision for accounting procedures to be consistent with this approach by incorporating the use of "reserves." [10]

In 1942 Congress defined reserves as being based on recognized mortality tables and an assumed rate of interest. The definition was intended to broaden the concept of reserves rather to restrict it.[11] There is no indication since that time that Congress intended to exclude other factors which would make the calculations of the reserve more precise or accurate. Indeed, in the 1959 Life Insurance Company Tax Act Congress recognized that a company might determine that it was necessary to weaken or strengthen its reserves[12] and made appropriate provisions for the process.

The pertinent portion of the statutory definition, 26 U.S.C. § 801(b)(1), reads:

" . . . 'life insurance reserves' means amounts . . .

9. While not binding on this Court or the Tax Court, the opinion of the Insurance Commissioner of New Jersey who was charged with administration of the state law is entitled to some weight. He testified that "To the extent that the reserve was established, at that point it was required by law because it required the approval of the Commissioner for it to be reduced or eliminated." (Transcript of Testimony, p. 51). *See also* Knickerbocker, *supra*, n. 2 at 375:
"However, once the company has established such a reserve, the company is no

longer free to reduce or eliminate the reserve as long as it remains subject to the risk so represented, unless permission to adjust the reserve is granted by the state insurance department."

10. 8 Mertens, supra, n. 2, §§ 44.16, 44.17.

11. S.Rep. No. 1631, 77th Cong., 2d Sess. (1942), reprinted in 1942–2 C.B. 504.

12. Sections 806(b) and 810(d) ; *See also*, H. R.Rep. No. 34, 86th Cong., 1st Sess. (1959), reprinted in 1959–2 C.B. 736, 794.

(A) which are computed or estimated on the basis of recognized mortality . . . tables and assumed rates of interest, and

(B) which are set aside to . . . liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance . . . contracts . . . involving, at the time with respect to which the reserve is computed, life . . . contingencies."

It may be seen that the "basic reserve" applicable to a lump sum payment is fully covered by this definition.

The Commissioner appears to argue that the "additional reserve" does not qualify because the optional mode of settlement involved in this case does not create any liability on the insurance company until such time as elected by the beneficiary. The Commissioner characterizes the transaction as the purchase of an annuity by a beneficiary with the lump sum proceeds of the policy.

■ We disagree and find that the insurer, in making payment under the specific settlement option involved in this controversy, does not enter into a new contract with the beneficiary but merely carries out the contractual obligation which arose with the initial issuance of the life insurance contract. *See* 19 Couch on Insurance 2d § 81:4. We see nothing in the statute which requires the construction which the Commissioner advocates and believe it contrary to generally accepted insurance law. Indeed, the government's position would come as somewhat of a surprise to the policyholder who pays the premium with the understanding that his beneficiary has the choice to take the optional settlement—at the values set out in the

policy and regardless of any inclination of the insurance company to the contrary.[13]

While it may be said that as to any one individual policy it could not be determined at issuance that the settlement option would be exercised, there is no doubt that as to the entire class of policies, utilization of the option was not speculative but a fact thoroughly established by experience in a large number of claims throughout the industry. For all practical purposes, then, the obligation of the Company to meet the "strain" was just as certain and definite as it was to meet the lump sum payment requirements for which the "basic reserve" was established.

■ The fact that the computation for the reserve included elements other than mortality tables and assumed rates of interest, is not sufficient to disqualify the "additional reserve." There is nothing in the statute which states that these two elements are the only factors which are permissible and that all others must be excluded. In the factual context present here, we can perceive no considerations which would require us to adopt a construction of the Act so narrow as to mandate the exclusion of circumstances which would tend to make the calculation of the reserve more exact.

Congress obviously sought to prevent abuse, and with this, of course, we thoroughly agree. The additional elements used here accomplished exactly what Congress did intend. We cannot ignore the fact that the additional elements of lapse rate, rate of election, and lowered mortality rates of the insured resulted in substantial reductions of the reserve. The recalculation to the lower levels in 1956 was at the request or insistence of

---

13. The Senate Committee report, in discussing the definition of life insurance reserves under § 201(C)(2) of the predecessor Act, said in part, "The elimination of contingent claims from the House bill is to permit the liability arising from insurance contracts providing for the payment of the proceeds in installments certain for a specified period and a continuation of their installment payments to a beneficiary so long as he might live, to be classified as a reserve if the contract involved a life contingency even if some part of the liability was held to meet noncontingent claims." S.Rep. No. 1631, 77th Cong., 2d Sess. (1942), Reprinted 1942–2 C.B. 504, 612. We interpret this to mean that the Senate Committee would recognize a reserve to meet the settlement option contingency if it were formulated at the time the policy is issued.

the New Jersey Insurance Commission which felt that the reserves were higher than need be. In a real sense then the adjustment of the reserves and inclusion of additional elements was necessary to establish compliance with New Jersey law. We need not hold that this action was necessary to meet the "required by law" test, but we do note that Congress was aware of the extensive, continuing supervision of the insurance industry by the states. It is obvious that subjecting the reserves to the scrutiny of the state regulatory agencies is an additional safeguard against overreaching by the companies.

There was testimony in this case to establish that if the challenged elements had not been used in the computations, the reserves would have been four or five times as high and would have been considered excessive by New Jersey. The substantial actuarial data used in this case and the approval by the State Commission which resulted in a realistic rather than an inflated reserve lead us to conclude that a tunnel vision approach to the Act here would result in distortion rather than a proper construction. The "additional reserve" represented money due the policyholders just as truly as did the "basic reserve."

The final shot fired by the Commissioner is that the "additional reserve" is a "deficiency reserve" and, thus, specifically excluded by the Code. The first and obvious question is, what is a "deficiency reserve." It is a technical term having a specific meaning in the industry which must be used in interpreting the definition of the Act. Alinco Life Insurance Company v. United States, 373 F.2d 336, 178 Ct.Cl. 813 (1967).

The statutory definition, 26 U.S.C. § 801(b)(4), reads:

" . . . that portion of the reserve . . . equal to the amount . . . by which—(A) the present value of the future net premiums required for such contract, exceeds (B) the present value of the future actual premiums and consideration charged for such contract."

The "deficiency reserve" is a concept in the industry which resulted from the rigid formulas imposed by state regulatory agencies in calculating "basic reserves." Many states required that the "basic reserve" for a policy was to be computed on the basis of the experience or mortality table in use at the time the policy was sold even though it was known at that time that life expectancy was increasing. This meant that in many instances the reserve was computed on the basis of a life expectancy lower than reality and therefore the premiums charged would be larger than necessary. Some companies set premium levels which they felt were adequate in view of the lengthening of life expectancy but which were less than that which strict adherence to the tables would require. The state required that in such a situation a "deficiency reserve" be set up to account for the difference between the premiums which should have been charged according to the mortality tables and those which were actually paid by the policyholder.[14]

It may be seen that one of the distinguishing characteristics of a "deficiency reserve" is that it is calculable at the moment of issue of a policy. At that time, the premium actually charged and that required by the standard mortality table are known and the "deficiency" in premium may easily be established. The adoption of updated and more accurate mortality tables resulted in the elimination or decrease of many "deficiency reserve" requirements for policies sold thereafter.

A "deficiency reserve" is not used to increase a policy "basic reserve" which was adequate when issued.[15] With this

14. See MacLean, Life Insurance, (9th ed. 1962), at p. 73.

15. As one of the witnesses explained at the trial of this case, "deficiency reserves" relate only to the situation at the time a policy is issued, and there is no situation after a policy is issued which would require a "deficiency reserve."

explanation as a background, it is clear that a "deficiency reserve" as that term is used in the industry is not applicable to an "additional reserve" which is set up after the policy is issued and to deal with problems that arose *after* issue.

When the definition in the Act is read in conjunction with the industry meaning [16] of the term, it is clear that the Commissioner was in error in considering the "additional reserve" as a "deficiency reserve." Here the "additional reserve" could not be ascertained at the time the policy was issued, and it was established to meet events which occurred many years after issuance of the policies.

Recognizing that the unresolved problems of the tax accountability of insurance reserves are many and complex, we have trod a narrow path chartered by the specific factual situations present here, and our opinion should be so understood. We emerge, concluding that the decision of the Tax Court was correct, and therefore its judgment will be affirmed.

---

16. 8 Mertens, *supra*, § 44.15 at p. 36, 37. *See also* General Life Insurance Co. v. Commissioner of Internal Revenue, 137 F.2d 185, 190, n. 1 (5th Cir. 1943).