William H. HUFF, III, Commissioner of Insurance of the State of Iowa, and the Department of Insurance of the State of Iowa, Appellant,

v.

ST. JOSEPH'S MERCY HOSPITAL OF DUBUQUE CORPORATION, St. Joseph's Mercy Hospital of Sioux City, Iowa, Mary Margaret Westrich, R.S.M. as Administrator of St. Joseph's Mercy Hospital of Sioux City, Iowa, and as Secretary of the Board of Trustees of St. Joseph's Mercy Hospital of Dubuque Corporation, Appellee.

No. 59743.

Supreme Court of Iowa.

Jan. 18, 1978.

696

Curtis A. Yocum, Jr., Asst. Atty. Gen. for Ins. Dept. of Iowa, appellant.

Robert A. Wichser, of Myers, Hirschbach & Wichser, and James W. Redmond, of Gleysteen, Harper, Kunze, Eidsmoe & Heidman, Sioux City, for appellee.

Heard by MOORE, C. J., and MASON, REES, REYNOLDSON and HARRIS, JJ.

MOORE, Chief Justice.

Plaintiff insurance commissioner appeals trial court order refusing to enjoin defendants' proposed prepaid plan for childbirth care and holding the plan was neither a "health maintenance organization" (HMO) plan nor a "contract of insurance." The Commissioner had contended defendants could not legally offer their proposed plan because they were neither licensed as an "HMO" nor certified as an "insurer." We affirm the trial court.

The relevant facts as stipulated by the parties are these. Defendant St. Joseph's Mercy Hospital is a nonprofit corporation consisting of several hospitals operating throughout the State of Iowa. St. Joseph's Mercy Hospital, Sioux City, is licensed pursuant to Code section 135B.3 with permanent facilities providing diagnosis and treatment to in-patients and out-patients as well as various support services.

Throughout 1975 in an attempt to resolve any potential legal complications, counsel for St. Joseph's Hospital communicated with the Department of Insurance concerning establishment of a prepaid obstetrical contract plan which the hospital proposed to offer to the general public. Pursuant to this plan the hospital would agree to furnish all necessary hospital services for seven days relative to childbirth for the mother and child for $400 provided that amount was prepaid a minimum of 15 days prior to delivery. If the hospital stay exceeded seven days, the regular hospital rate would become effective commencing on the eighth day. In the event the patient incurred normal hospitalization charges of less than $400, the hospital would refund to her the difference between the incurred charge and $400. If the patient did not enter the hospital, the $400 prepayment would be refunded by the hospital. The contract expressly applied to hospital services only and in no way affected the arrangement between the patient and her physician.

The parties agreed that all necessary X-ray and lab work was contracted out by the defendant-hospital to an independent physician, that these lab services were included in the prepaid $400 fee and that the hospital, rather than the patient, paid a predetermined percentage of such charges to the physician.

The Commissioner of Insurance challenged the legality of this prepayment plan. He argued it constituted an offer to provide health care services under Code chapter 514B and, as such, was prohibited because the hospital was not licensed as a Health Maintenance Organization as required by chapter 514B.

The Commissioner also argued that the plan constituted insurance and because the hospital was not licensed as an insurer, with minimum financial reserve requirements, it could not offer the contracts.

Notwithstanding this opposition, defendant-hospital entered into the plan with numerous obstetrical patients in the Sioux City area. On March 9, 1976 the Commissioner filed his petition seeking a temporary and permanent injunction prohibiting the hospital from offering Iowa residents the "prepaid obstetric" plan.

On July 22, 1976 trial court denied the injunction. Commissioner has appealed.

I. This action for injunctive relief is a civil action standing in equity and thus we hear the appeal de novo, Rule 4, Rules of Appellate Procedure.

■ Our primary task here is to construe defendant-hospital's prepaid obstetrical contract offered to its patients in light of the Insurance Commissioner's two-pronged attack. Of course, construction, the legal effect of a contract, is always a matter of law to be decided by the court. *Spilman v. Board of Directors of Davis County*, Iowa,

253 N.W.2d 593, 595; *Westhoff v. American Interinsurance Exchange,* Iowa, 250 N.W.2d 404, 408.

■■■ We recognize the Commissioner of Insurance is clothed with broad powers over the control, supervision and direction of all insurance business transacted in the state. Code section 505.8; *Chicago Title Ins. Co. v. Huff,* Iowa, 256 N.W.2d 17, 29; *Bankers Life & Cas. Co. v. Alexander,* 242 Iowa 364, 371–373, 45 N.W.2d 258, 262, 263. Section 514B.27 specifically empowers him to seek an injunction against violators of the HMO Act. As an administrative officer he may at times exercise quasi-legislative or quasi-judicial powers. *Davenport Hosp. Ass'n v. Hospital Service, Inc.,* 261 Iowa 247, 257–258, 154 N.W.2d 153, 160. However, it is the ultimate function of the courts to determine the legality of his administrative decisions. *Davenport Hosp. Ass'n v. Hospital Service, Inc.,* supra; *Iowa Mut. Tornado Ins. Ass'n v. Timmons,* 252 Iowa 163, 171, 105 N.W.2d 209, 213.

II. The Commissioner first asserts the "prepaid obstetrical contract" is in reality a "Health Maintenance Organization" plan as defined by chapter 514B and because defendants are not licensed under that statute the use of the contract must be enjoined.

Before examining in detail the definitional sections of chapter 514B upon which resolution of this issue turns, we believe some introduction to the concept of HMO is necessary. The combined concern with rising costs of health care and lack of access by many people to quality health care has generated increased interest in alternative health care systems throughout this country. The health maintenance organization concept is explained in an article which appears in 10 Forum 405, "Health Maintenance Organizations HMOs: Do They Really Work?", authored by James E. Ludlam in 1974 when the idea was gaining widespread support through both federal and state legislation.

The author discusses the forces which have existed both for and against the concept (particularly physicians who resist the interference with the traditional physician-patient relationship) and raises the question whether the broad, comprehensive minimum health care benefits patient charge may price HMOs out of the market. For further general discussion of the concept see Meyer, Life and Health Insurance Law, chapter 12A, § 12A:1 at 73–75, (1977 Cum. Supp.). In summary, there are really three basic principles involved with the HMO concept. They are: 1) an organizational system wherein health care providers are brought together; 2) a comprehensive basic health care system which emphasizes preventive medicine; 3) a plan of prepaid payments by enrollees is utilized.

In order to transform this concept into reality both the federal congress and numerous state legislatures have enacted comprehensive HMO legislation. An analysis and comparative evaluation of these statutes has been the subject of some outstanding recent periodicals. See Kissam and Johnson, "State HMO Laws And The Theory Of Limited Reformmongering", 25 Kan. L.Rev. 21; Kissam and Johnson, "Health Maintenance Organizations And Federal Law: Toward A Theory Of Limited Reformmongering", 29 Vand.L.Rev. 1163; Epstein, "Federal And State Definitions of Health Maintenance Organizations", 23 Drake L.Rev.Ins.L. Annual 782.

In 1973 our legislature also responded to the need for health care alternatives and enacted chapter 274, 65 G.A. (1973 Session), an Act to authorize the establishment and continuing regulation of health maintenance organizations, now codified at chapter 514B, The Code. Central to an understanding of the scope of the statute is the definitional section 514B.1 which provides:

"514B.1 Definitions. As provided in this chapter, unless the context otherwise requires:

"1. *'Commissioner'* means the commissioner of insurance.

"2. *'Health care services'* means services included in the furnishing to any individual of medical or dental care, or hospitalization, or incident to the furnishing of such care of hospitalization, as well as the furnishing to any person of all

other services for the purposes of preventing, alleviating, curing, or healing human illness, injury, or physical disability.

"3. *'Health maintenance organization'* means any person which:

"a. Provides either directly or through arrangements with others, health care services to enrollees on a fixed prepayment basis;

"b. Provides either directly or through arrangements with other persons for basic health care services; and,

"c. Is responsible for the availability, accessibility and quality of the· health care services provided or arranged.

"4. *'Enrollee' means an individual who is enrolled in a health maintenance organization.*

"5. *'Provider'* means any physician, hospital, or person as defined in chapter 4 which is licensed or otherwise authorized in this state to furnish health care services.

"6. *'Basic health care services' means services which an enrollee might reasonably require in order to be maintained in good health, including as a minimum, emergency care, in-patient hospital and physician care, and out-patient medical services rendered within or outside of a hospital.*

"7. *'Evidence of coverage'* means any certificate, agreement, or contract issued to an enrollee setting out the coverage to which he is entitled." (Emphasis supplied.)

The crux of the Commissioner's argument here is that the uncertified defendants may not offer the prepaid contract, which by definition constitutes a "health care service," because they do not additionally offer the minimum package of health care services required by chapter 514B.

Thus, we must decide whether the thrust of chapter 514B is to prohibit all independent contracts for prepaid health service that are not part of a total basic package of health care services. In making this determination we are guided by several well-settled principles which we recently summarized in *Doe v. Ray*, Iowa, 251 N.W.2d 496, 500, 501, as follows:

"In interpreting these statutes we are guided by familiar principles of statutory construction. Of course, the polestar is legislative intent. *Iowa Dept. of Rev. v. Iowa Merit Employ. Com'n.*, Iowa, 243 N.W.2d 610, 614; *Cassady v. Wheeler*, Iowa, 224 N.W.2d 649, 651. Our goal is to ascertain that intent and, if possible, give it effect. *State v. Prybil*, Iowa, 211 N.W.2d 308, 311; *Isaacson v. Iowa State Tax Commission*, Iowa, 183 N.W.2d 693, 695. Thus, intent is shown by construing the statute as a whole. In searching for legislative intent we consider the objects sought to be accomplished and the evils and mischiefs sought to be remedied in reaching a reasonable or liberal construction which will best effect its purpose rather than one which will defeat it. *Peters v. Iowa Emp. Security Com'n.*, Iowa, 235 N.W.2d 306, 310; *Iowa Nat. Indus. Loan Co. v. Iowa State, etc.*, Iowa, 224 N.W.2d 437, 440. However, we must avoid legislating in our own right and placing upon statutory language a strained, impractical or absurd construction. *Cedar Mem. Park Cem. Ass'n v. Personnel Assoc., Inc.*, Iowa, 178 N.W.2d 343, 347.

"Finally, we note that in construing a statute we must be mindful of the state of the law when it was enacted and seek to harmonize it, if possible, with other statutes relating to the same subject. *Egan v. Naylor*, 208 N.W.2d 915, 918 and citations."

Additionally, we have said in construing a statute we attempt to give it a sensible, practical, workable and logical construction. *Doe v. Ray*, supra, 251 N.W.2d at 504; *Lynch v. Bogenrief*, Iowa, 237 N.W.2d 793, 796. Trial court based its ruling rejecting the Commissioner's argument on the dual grounds that defendants are not subject to chapter 514B because they do not solicit "enrollees" nor do they provide "basic health care services."

Construing the hospital's contract in light of these principles, we do not believe the legislature intended this limited payment alternative for obstetrical patients to be classified as an HMO with all concomitant restrictions. The challenged contract is a prepaid *payment plan* covering the *individual* obstetrical patient, nothing more. Thus, the patients are not "enrollees" as defined at Code section 514B.1. Furthermore, there is no emphasis on preventative comprehensive services for the purposes of "preventing, alleviating, curing or healing human illness, injury or physical disability." If the legislature intended to prohibit a single payment for a single type of health service absent registration with the Insurance Commissioner, then this should be specified by an amendment. In this regard see Epstein, 23 Drake L.Rev.Ins.L. Annual at 804–805.

We hold plaintiff-appellant's first claim for reversal is untenable.

III. The Commissioner next contends trial court erred in concluding the "prepaid obstetrical contract" is not a contract of insurance and thus the hospital need not be certified as an insurer.

Prefatorily we note the term "insurance" is not specifically defined within the Iowa Code. Thus in determining whether defendant was selling insurance we must look through the form of the transaction to determine whether the relationship of insured and insurer exists. As stated in 12 Appleman, Insurance Law and Practice, section 7001, page 2:

"Where no statutory definition is contained of the term 'insurance', it must be applied as generally understood in the law of the state. In determining whether a corporation is doing an insurance business, the court must look through the form of the transaction to determine whether the relationship of insurer and insured exists. Whether the contract is one of insurance must be determined from. its purpose, effect, content, terminology, and conduct of the parties, and not from its designation therein, since a contract which is fundamentally one of insurance cannot be altered by the use or absence of words in the contract itself. The court must look also to the intention of the parties in making this determination."

In *State v. Timmer*, 260 Iowa 993, 999, 151 N.W.2d 558, 561, we adopted this definition of insurance:

"* * *. 'More broadly, however, the term "insurance," or "insurance contract," or "insurance policy," * * * denotes a contract by which one party, for a compensation called the "premium," assumes particular risks of the other party and promises to pay to him or his nominee a certain or ascertainable sum of money on a specified contingency; * *'"

For like definitions see 1 Couch on Insurance 2d, section 1:2; 43 Am.Jur.2d, Insurance, section 1; 44 C.J.S. Insurance § 1.

Professor Robert E. Keeton in his Basic Text on Insurance Law at page 6 writes:

"All insurance contracts concern risk transference, but not all contracts concerning risk transference are insurance. The complex bundle of risks from a venture gives rise to a variety of kinds of legal risk transference, some of which are not regarded as insurance for any purpose, and some of which are regarded as insurance for one purpose but not for another. Even in states having the broadest statutory or decisional definitions of insurance, which if literally applied would include all or nearly all contracts transferring risk, many arrangements literally within such definitions are not treated as insurance transactions in legal contexts."

Applying the above legal principles and definitions to the prepaid obstetrical contracts here involved, we conclude they are not contracts of insurance subject to regulation by the Commission. It must be noted they do cover the risks of assorted complications but the principal benefit or effect is the hospital care as opposed to a minimal indemnity feature. Additionally, the contracts in their operation are not in-

surance because there is express provision for refund or additional charge depending on the actual hospital expense incurred.

We agree with the judgment of the trial court.

AFFIRMED.