EQUITABLE LIFE INSURANCE COMPANY OF IOWA, PETITIONER
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10721–75.    Filed December 17, 1979.

*James R. Mumford,* for the petitioner.
*Seymour I. Sherman,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax for the taxable years 1964 through 1972 in the amounts of $1,230,582.18, $333,927.61, $391,439.10, $322,273.64, $403,803.07, $489,036.51, $522,283.19, $440,392.65, and $471,804.99, respectively. Following the settlement of numerous issues raised by the pleadings, those remaining for decision are:

(1) Whether additional reserves established by petitioner to supplement basic reserves for certain life insurance policies

---

which provided an option to the insured or his beneficiary to elect a life annuity qualify as life insurance reserves under section 801(b), I.R.C. 1954,[1] and

(2) Whether reserves established in connection with two nonqualified retirement plans qualify as life insurance reserves under section 801(b).

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner Equitable Life Insurance Co. of Iowa is an Iowa corporation which had its principal office in Des Moines, Iowa, at the time of filing its petition in this case. Petitioner filed timely Federal income tax returns for each of the calendar years 1964 through 1968 with the District Director of Internal Revenue in Des Moines, Iowa, and for each of the calendar years 1969 through 1972 with the Internal Revenue Service Center in Kansas City, Mo.

Petitioner, during each of the years in question, was in the business of issuing and selling insurance policies and was taxable as a life insurance company for Federal income tax purposes.

Some of the life insurance policies issued by petitioner, at least since 1930, have provided for settlement options under which the person entitled to the policy proceeds upon the death of the insured may elect benefits other than a single lump-sum payment. Such settlement options often include the right to elect annuity payments. When such a right exists, the annuity rates (i.e., the monthly or other periodic payment per $1,000 of proceeds) are fixed in the policy as issued for various potential attained ages of the beneficiary or other payee. Petitioner, since the 1930's, has also issued annuity policies with settlement options which included the right of the insured to select a lifetime annuity (hereinafter annuity guarantees) at predetermined rates set forth in the policy. Life insurance reserves were established with respect to the basic obligation of petitioner to pay the amounts required by the life insurance and annuity policies. The basic reserves were adequate for lump-sum settlements and such reserves are therefore not in controversy.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

By the 1950's, the basic reserves had become inadequate when the insured or the beneficiary elected, under the contract, the annuity in lieu of the lump-sum death settlement. The annuity guarantees of the contracts issued during the 1930's and until 1943 were based on obsolete mortality tables.[2] Additionally, by the 1950's, average life expectancies had increased and interest rates remained relatively low.[3]

During the insurance examination by the Insurance Department of Iowa (hereinafter the department) for the year 1959, petitioner notified the department of its intention to establish additional reserves to reflect the inaccuracies in the mortality table and interest rate assumptions upon which the basic reserves were calculated. Following informal discussions, the department agreed to the additional reserves, which were to be maintained as life insurance reserves. Petitioner formally advised the insurance commissioner for Iowa of its additional reserves by letter dated October 28, 1960. On November 14, 1960, the letter was stamped approved by the insurance commissioner.

The additional reserves, upon creation, became subject to the control of the department and could not be reduced or removed without approval of the insurance commissioner.[4] Beginning in 1959 and continuing through 1972, petitioner maintained the additional reserves on its books and records, reporting them each year on its annual statement filed with the department.[5]

Within the years in issue, 1964–72, the department made three triannual examinations of petitioner—1964, 1967, and 1970. In each instance, a complete audit of petitioner's reserves was made by the department. The audit ascertained that all of the reserves of petitioner were calculated correctly and that the reserves

[2]Policies issued prior to 1935 were based on mortality tables from the 1800's, and from 1935 until 1943, on tables from the 1920's. Use of the 1800's mortality tables prior to 1935 had been required by State law.

[3]Having based its annuity payment schedule on interest and mortality assumptions, petitioner would benefit from higher interest rates and lower life expectancies than contemplated. During the 1950's, the interest rate was lower, and average life expectancy higher, than assumed. Thus, the annuity settlement option was more costly to petitioner than predicted.

[4]The principal financial concern of the department is the continued solvency of the company, so as to protect and guarantee its ability to pay the promised benefits under the policies issued. The basic concern with respect to reserves is that they be adequate for those purposes. The department, however, would be concerned if superfluous reserves were established because participating life insurance policies share in the earnings of the company.

[5]The computation of the additional reserves was based on 1959 data. The assumptions from that study were carried forward for the additional reserve computation for the years 1960 through 1972. Had the data been updated, different amounts would have been calculated for the additional reserves in those years than were calculated under the 1959 assumptions.

covered all of petitioner's liabilities. At all times in issue, petitioner filed its tax returns on the calendar year basis. In the years 1964 through 1972, petitioner filed its Federal income tax returns on Form 1120L with the annual convention statement attached as part of the return in each year.

In the notice of deficiency, respondent determined that the additional reserves maintained by petitioner during the years 1964 through 1972, with respect to annuity guarantees, which it treated as life insurance reserves in computing its Federal income tax liability, did not qualify as life insurance reserves for Federal income tax purposes.

In 1950, petitioner established a retirement benefit plan known as "Equifund," covering those of its field representatives who met certain qualifications. The Internal Revenue Service ruled that the plan was qualified under section 401(a). Additionally in 1950, petitioner adopted retirement benefit plans "Equifund B" and "Equifund C," neither of which qualified under section 401(a). Each of these three retirement benefit plans was in existence during the taxable years at issue.

Equifund B is a retirement plan for part-time life insurance salesmen and those life insurance salesmen who were not participants in the Equifund plan. Equifund C is a retirement benefit plan for general agents of petitioner who are not full-time life insurance salesmen.

The Equifund B and C plans were funded[6] by a combination of deposits by participants and contributions by petitioner. The contributions of petitioner, as well as interest accrued thereon, were contingent and subject to forfeiture.

Equifund B, in pertinent part, provides:

II. ADMINISTRATION.

Equifund B shall be under the direction of the Company. Depositors or annuitants in Equifund B shall furnish the Company with any information necessary for the administration of Equifund B, and the action of the Company on any question involving Equifund B or the interpretation or application of Equifund B shall be final.

\* \* \* \* \* \* \*

V. ACCOUNTS.

\* \* \* \* \* \* \*

B. Contributions by the Company will be allocated conditionally to the

---

[6]The reserves established under these plans were book reserves with no separate trust nor segregated funds.

individual depositiors and an account kept with each individual depositor showing the accumulated Company contributions to his credit, such allocated contributions to be subject to the provisions of Equifund B.

\* \* \* \* \* \* \*

D. The net total of deposits, contributions, and interest shall constitute a part of the general funds of the Company and may be mingled therewith and shall be invested by the Company.

E. Any attempted alienation, assignment, transfer, sale, or pledge of any interest in any part of Equifund B or payments thereunder shall automatically forfeit, cancel, and terminate the depositor's or annuitant's interest, right and title to all of such part of the benefits of Equifund B as shall have arisen from the Company contributions with interest, and the benefits shall be accordingly reduced. \* \* \*

\* \* \* \* \* \* \*

VII. OLD-AGE BENEFITS.

A. The sum of the accumulated deposits and the accumulated contributions credited to the account of the depositor at the age elected for commencement of old-age benefit payments, will be used to provide a life refund or last survivor annuity for the depositor, such annuity to be calculated on the basis of the net rates in accordance with the American Annuitants' Male Select mortality table with 3% interest stepped back one age for males and five ages for females, and in accordance with the rules of the Company then in effect as to minimum payments on annuities and subject to satisfactory evidence of age.

B. In the event of the death of an annuitant in receipt of a refund annuity before the total of the annuity payments made by the Company is equal to the sum stated above used to provide the annuity, the Company will continue the annuity payments to the beneficiary named by the depositor and recorded by the Company until the total annuity payments made shall equal the said sum. If said beneficiary dies before receiving the balance of annuity payments due, then any such payments remaining will be commuted at the rate of 3% per annum compound interest, and paid in one sum to the executors or administrators of said beneficiary unless the depositor has named a contingent beneficiary or beneficiaries to whom the remainder of said payments shall be paid as they fall due. If any contingent beneficiary shall die while in receipt of payments, then any remaining payments which would have been paid to him if living, will be commuted at the rate of 3% per annum compound interest and paid in one sum to his executors or administrators. If there be no beneficiary living at the death of the annuitant then any further payments due will be commuted at the rate of 3% per annum compound interest and paid in one sum to the executors or administrators of the annuitant. If the payments to any beneficiary will be less than $10.00 a month, then said payments shall be commuted at the rate of 3% per annum compound interest and paid in one sum to said beneficiary.

C. If the last survivor annuity option is chosen, the annuity payments will be continued to the co-annuitant if the annuitant predeceases the co-annuitant. The co-annuitant must be the wife of the annuitant.

VIII. DEATH BENEFITS.

A. In the event of the death of a depositor before old-age or disability benefits commence, the sum of his accumulated deposits and the Company's accumulated contributions will be paid to the beneficiary * * * , except if the depositor has not had five years of continuous service with the Company only his accumulated deposits will be payable.

*　　*　　*　　*　　*　　*　　*

IX. DISABILITY BENEFITS

A. In the event a depositor, who has had five years continuous service with the Company, becomes totally and permanently disabled as determined by the Company before old-age benefit payments commence, contributions and deposits shall cease at the end of the month prior to that in which the Company determined that the depositor was totally and permanently disabled. The sum of his accumulated deposits and the accumulated contributions will be used to provide a refund annuity, on the basis shown in Section VII or in such other manner on an equivalent actuarial basis as may be mutually agreed upon between the Company and the depositor. The first annuity payments shall be made at the end of the month in which the Company determined that the depositor was totally and permanently disabled unless the depositor elects to defer the start of the annuity payments for a period not to exceed five years, in which event the annuity payments will be based on the sum of the accumulated deposits and the accumulated contributions at the date the annuity payments commenced. If said sum is not sufficient to provide an annuity of at least $10.00 per month, it shall be paid to the depositor in one sum.

B. Should a disabled depositor recover from his disability as determined by the Company no further payments will be made, but if the sum of the payments already made is less than the sum of the total accumulated deposits at the end of the month in which the Company determined the depositor was totally and permanently disabled, then the balance will be paid to the depositor in one sum, except that if upon recovery he re-enters the service of the Company, any excess of the sum of the accumulated deposits and the accumulated contributions over the amounts paid to the depositor will be credited to him in Equifund B and will thereafter draw interest as provided in Section V, C.

C. In the event of the death of an annuitant in receipt of a refund annuity before the total of the payments made is equal to the sum of the total accumulated deposits and accumulated contributions used to provide the annuity, the Company will continue the annuity payments in the same manner as provided for in the event of the death of an annuitant in Section VII, B.

D. If a depositor who has not had at least five years continuous service with the Company becomes totally and permanently disabled as determined by the Company, contributions and deposits shall cease and the sum of his accumulated deposits will be paid to him.

X. WITHDRAWAL BENEFITS.

A. (1) If a member fails at the end of any calendar year to meet the requirements of Section IV, paragraph A hereof [required minimum premium production], he shall cease to be a member of Equifund B at the end of said year, and his own accumulated deposits and the Company's accumulated

contributions (except as hereinafter expressly provided) * * * , will be paid to him, or held for his benefit, in accordance with the following provisions:

(a) If the former member continues under contract as an agent, part-time agent, or general agent of the Company, or if he becomes a Home Office employee of the Company, * * * ; PROVIDED FURTHER, that at the written request of such former member, his own accumulated deposits will be paid to him in one sum, but the Company's accumulated contributions standing conditionally to the credit of such former member shall be returned to the Company.

(b) If a member or a former member ceases before old-age benefits commence to be under contract as an agent, part-time agent, or general agent of the Company, and is not a Home Office employee, and is not receiving disability benefits under Sec. IX hereof, his own accumulated deposits will then be paid to him in one sum, but the Company's accumulated contributions standing conditionally to the credit of such member or former member shall be returned to the Company.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

B. All the Company's accumulated contributions standing conditionally to the credit of such withdrawing depositor, except as otherwise herein provided, shall be returned to the Company.

XI. TERMINATION OF EQUIFUND B.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

B. Anything in this or any other section of Equifund B to the contrary notwithstanding, in the case of any member or depositor covered by this plan, the Company reserves the right at any time in its uncontrolled discretion to forfeit the interest, rights and title of such member or depositor or annuitant or beneficiary or personal representative thereof, to all contributions or accumulated contributions made to the credit of such member under Equifund B or to any benefits arising therefrom; and upon exercise of such right of forfeiture the benefit or benefits shall be proportionately reduced. * * *

Equifund C,[7] in pertinent part, provides:

II. ADMINISTRATION.

EQUIFUND [C] shall be under the direction of the Company. Depositors or annuitants in EQUIFUND [C] shall furnish the Company with any information necessary for the administration of EQUIFUND [C], and the action of the Company on any question involving EQUIFUND [C] or the interpretation or application of EQUIFUND [C] shall be final.

---

[7]Equifund C for general agents is similar to Equifund for career agents; however, Equifund C does not qualify as a pension plan under sec. 401(a). Under Equifund C, petitioner could require forfeiture of a member's interest in the accumulated contributions made by petitioner. Additionally, general agents under Equifund C were not required to make deposits. The Equifund C plan of which portions are quoted in the text above is only one of several versions of Equifund C in effect during the years at issue. The quoted provisions are from the earliest version in the record, bearing the legend "Rev 3–62" in the lower left-hand corner.

\*      \*      \*      \*      \*      \*      \*

## V. ACCOUNTS.

\*      \*      \*      \*      \*      \*      \*

B. Contributions by the Company will be allocated conditionally to the individual depositors and an account kept with each individual depositor showing the accumulated Company contributions to his credit, such allocated contributions to be subject to the provisions of EQUIFUND [C].

\*      \*      \*      \*      \*      \*      \*

D. The net total of deposits, contributions, and interest shall constitute a part of the general funds of the Company and may be mingled therewith and shall be invested by the Company.

E. Any attempted alienation, assignment, transfer, sale or pledge of any interest in any part of EQUIFUND [C] or payments thereunder shall automatically forfeit, cancel, and terminate the depositor's or annuitant's interest, right, and title to all of such part of the benefits of EQUIFUND [C] as shall have arisen from the Company contributions with interest, and the benefits shall be accordingly reduced. No withdrawal of any portion of a depositor's accumulated deposits will be permitted except as outlined in Sections VII, VIII, IX, and X.

\*      \*      \*      \*      \*      \*      \*

## VII. OLD-AGE BENEFITS.

A. The sum of the accumulated deposits and the accumulated contributions credited to the account of the depositor, at the age elected for commencement of old-age benefit payments, will be used to provide a life, refund or last survivor annuity for the depositor, such annuity to be calculated on the basis of net rates determined as follows, and in accordance with the rules of the Company then in effect as to minimum payments on annuities and subject to satisfactory evidence of age:

(1) For deposits and contributions made prior to January 1, 1960, with interest accumulated thereon, annuity returns in accordance with the American Annuitant's Male Select Mortality Table with 3% interest rated back one age for males and five ages for females, and

(2) For deposits and contributions made on and after January 1, 1960, with interest accumulated thereon, annuity returns in accordance with the 1937 Standard Annuity Mortality Table with 3% interest rated back one age, provided, however, that the annuity returns shall not exceed 110% of the corresponding returns guaranteed in policies being issued by the Company at the time the deposits and contributions were made.

B. In the event of the death of an annuitant in receipt of a refund annuity before the total of the annuity payments made by the Company is equal to the sum stated above used to provide the annuity, the Company will continue the annuity payments to the beneficiary named by the depositor and recorded by the Company, if living, otherwise to the contingent beneficiary named by the depositor and recorded by the Company, if living, until the total annuity payments made shall equal the said sum; it being understood that said beneficiary after the death of the depositor, and said contingent beneficiary after the death of depositor and beneficiary, shall have the right to receive in one sum the value of any such payments remaining (said payments to be

commuted at the rate of 3% per annum compound interest). In the event of the death of the last survivor of the annuitant, beneficiary, and contingent beneficiary before the total of annuity payments made by the Company shall equal the sum stated above used to provide the annuity, any remaining payments will be commuted at the rate of 3% per annum compound interest and the commuted value paid in one sum to the executors or administrators of the last survivor of the said annuitant, beneficiary, and contingent beneficiary. If the payments to any beneficiary will be less than $20 a month, then said payments shall be commuted at the rate of 3% per annum compound interest and paid in one sum to said beneficiary.

C. If the last survivor annuity option is chosen, the annuity payments will be continued to the co-annuitant if the annuitant predeceases the co-annuitant. The co-annuitant must be the wife of the annuitant.

*   *   *   *   *   *   *

VIII. DEATH BENEFITS.

A. In the event of the death of a depositor before withdrawal, old-age or disability benefits commence, the sum of his accumulated deposits and the Company's accumulated contributions will be paid to the beneficiary * * * , except if the depositor has not had five years of continuous service with the Company only his accumulated deposits will be payable.

*   *   *   *   *   *   *

IX. DISABILITY BENEFITS.

A. In the event a depositor, who has had five years of continuous service with the Company, becomes totally and permanently disabled so that he is wholly prevented from following any gainful occupation whatsoever as determined by the Company in a nondiscriminatory manner before old-age benefits commence, contributions and deposits shall cease at the end of the month prior to the month in which the depositor becomes totally and permanently disabled. The sum of his accumulated deposits and the accumulated contributions will be used to provide a refund annuity, on the basis shown in Section VII or in such other manner on an equivalent actuarial basis as may be mutually agreed upon between the Company and the depositor.

The first annuity payment shall be made at the end of the month in which the Company determined that the depositor was totally and permanently disabled unless the depositor elects to defer the start of the annuity payments for a period not to exceed five years, in which event the annuity payments will be based on the sum of the accumulated deposits and the accumulated contributions at the date the annuity payments commence. If said sum is not sufficient to provide an annuity of at least $20 per month, it shall be paid to the depositor in one sum.

B. Should a disabled depositor recover from his disability as determined by the Company no further payments will be made, but if the sum of the payments already made is less than the sum of the total accumulated deposits at the end of the month in which the Company determined the depositor was totally and permanently disabled, then the balance will be paid to the depositor in one sum, except that if upon recovery he re-enters the service of the Company, any excess of the sum of the accumulated deposits and the accumulated contributions over the amounts paid to the depositor will be

credited to him in EQUIFUND [C] and will thereafter draw interest as provided in Section V, C.

C. In the event of the death of an annuitant in receipt of a refund annuity before the total of the payments made is equal to the sum of the total accumulated deposits and accumulated contributions used to provide the annuity, the Company will continue the annuity payments in the same manner as provided for in the event of the death of an annuitant in Section VII, B.

D. If a depositor who has not had at least five years of continuous service with the Company becomes totally and permanently disabled as determined by the Company, contributions and deposits shall cease and the sum of his accumulated deposits will be paid to him.

X. WITHDRAWAL BENEFITS.
    A. (1) * * *

    \*        \*        \*        \*        \*        \*        \*

(b) If a member or former member ceases before old-age benefit payments commence to be under contract as an agent, part-time agent, or general agent of the Company, and is not a Home Office employee, and is not receiving disability benefits * * * , his own accumulated deposits will then be paid to him in one sum, but the Company's accumulated contributions standing conditionally to the credit of such member or former member shall be left in EQUIFUND [C] and shall be used to reduce future Company contributions to Equifund [C]; * * * . The old-age benefits will be determined as provided in section VII by application of his accumulated deposits and his vested amount of accumulated contributions. PROVIDED, HOWEVER, that at any time prior to the date old-age benefits commence, such member or former member can request in writing a return of his own accumulated deposits and such accumulated deposits will be paid to him in one sum, but the Company's accumulated contributions vested in him in accordance with this paragraph shall be divested and shall be left in EQUIFUND [C] and shall be used to reduce future Company contributions to EQUIFUND [C].

    \*        \*        \*        \*        \*        \*        \*

XIII. CHANGE OR TERMINATION OF EQUIFUND [C] [8]
    A. The provisions of Equifund C may be modified or terminated at any time by the Board of Trustees of the Company, and such modification or termination shall be binding on all members, depositors, annuitants, and beneficiaries thereof. No such change shall affect any accumulated deposits or contributions to the credit of any depositor that shall have accrued prior to the first day of the then current calendar year.

    B. Anything in this or any other section of Equifund C to the contrary notwithstanding, in the case of any member or depositor covered by this plan, the Company reserves the right at any time in its uncontrolled discretion to forfeit the interest, rights and title of such member or depositor, or annuitant, or beneficiary or personal representative thereof, to all contributions or accumulated contributions made to the credit of such member under Equifund

---

[8]Unlike the other portions quoted, the "Change or Termination of Equifund [C]" provisions are modifications of the Equifund provisions.

C or Equifund B if he has been a member of Equifund B or to any benefits arising therefrom; and upon exercise of such right of forfeiture the benefit or benefits shall be proportionately reduced; provided, however, the Company shall not take action forfeiting any such interest, rights or title after it has been established by a final ruling of the U. S. Commissioner of Internal Revenue, or by a decision of the U. S. Treasury Department, or by a final decision of a court of competent jurisdiction or by an Act of the Congress of the United States that the member or depositor is or was an "employee" or is or was entitled to be treated as an employee for the purpose of applying the provisions of Section 403 of the 1954 Internal Revenue Code.

Under both Equifund B and Equifund C, regardless of the time of his participation in the plan, a participant had no right to any cash value in the plan. No actual annuity contracts were issued to participants or their beneficiaries prior to retirement, death, or disability. The Equifund B and Equifund C reserves, however, were established by petitioner on the basis of the amount of the pension petitioner determined would be provided to the part-time and general agents at retirement.

Petitioner set up the necessary pension plan reserves on its books to meet obligations to provide annuities under Equifund B and Equifund C if and when a participant retired as if it were a life insurance obligation. These reserves appeared on petitioner's books when they were examined by examiners from the Iowa Department of Insurance.

Life annuity reserves established under the Equifund B and Equifund C plans were computed on the basis of a recognized mortality table and assumed rates of interest. They were set aside to mature or liquidate future unaccrued claims arising from the annuity contracts as they would be issued pursuant to election of the annuity option.

Petitioner treated the reserves with respect to its Equifund B and Equifund C plans as life insurance reserves in computing its Federal income tax liability. Each year, petitioner reported as premium income both its contributions and the participants' contributions in Equifund B and Equifund C. Additionally, it reported as premium income those amounts considered as the taxable portion of annuity payments due to retirees under nonqualified pension plans. Petitioner deducted as death benefits those benefit payments made under the Equifund B and Equifund C plans. In the statutory notices of deficiency for the taxable years 1964 through 1972, respondent determined that

the reserves for Equifund B and Equifund C did not qualify as life insurance reserves for Federal income tax purposes.

Additionally, in the statutory notices of deficiency for the taxable years 1964 through 1972, respondent treated the Equifund B and C plans as plans for deferred compensation. In accordance with such characterization, respondent (1) allowed deductions in full for all actual benefits paid to participants in each respective taxable year; (2) eliminated from premium income all contributions to the plans; and (3) eliminated amounts designated as funding the plans from the computation of life insurance reserves for purposes of computing policy and other contract liability requirements, required interest, and life insurance reserves. Employee contributions were treated as interest-bearing liabilities, and petitioner was allowed a deduction for the interest liability accrued thereon. When an employee acquired a vested interest in the Equifund B or Equifund C plans, the accumulated contributions of the employee, including interest increments, were treated as premium income. And on this basis, qualifying life insurance reserves were allowed.

## OPINION

Section 801(b)(1),[9] defines "life insurance reserves" as amounts (1) computed or estimated under recognized mortality or morbidity tables and assumed rates of interest (sec. 801(b)(1)(A)); and (2) set aside to mature or liquidate, by payment or reinsurance, future unaccrued life insurance, annui-

---

[9]For the taxable years 1964 through 1969, sec. 801(b), in pertinent part, reads as follows:

(b) LIFE INSURANCE RESERVES DEFINED.—

    (1) IN GENERAL.—For purposes of this part, the term "life insurance reserves" means amounts—
        (A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and
        (B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.
    (2) RESERVES MUST BE REQUIRED BY LAW.—Except—
        (A) in the case of policies covering life, health, and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation,

    \*        \*        \*        \*        \*        \*        \*

    (C) as provided in paragraph (3), in addition to the requirements set forth in paragraph (1), life insurance reserves must be required by law.

Although some changes were made in the provisions of sec. 801(b) for the taxable years 1970 through 1972, the provisions here pertinent were not changed in substance.

ty, and noncancelable health and accident insurance contracts involving life, health, or accident contingencies (sec. 801(b)(1)(B)). Section 801(b)(2), in addition, provides that life insurance reserves must be required by law.[10]

In the instant case, section 508.36 of the Iowa Code Annotated[11] requires reserves for all outstanding life insurance

---

[10]Sec. 1.801–5(b), Income Tax Regs., defines the term "reserves required by law" as follows:

(b) *Reserves required by law defined.* For purposes of part I, subchapter L, chapter 1 of the Code, the term "reserves required by law" means reserves which are required either by express statutory provisions or by rules and regulations of the insurance department of a State, Territory, or the District of Columbia when promulgated in the exercise of a power conferred by statute, and which are reported in the annual statement of the company and accepted by state regulatory authorities as held for the fulfillment of the claims of policyholders or beneficiaries.

[11]Sec. 508.36, Iowa Code Ann., provides in part:

508.36 Standard valuations

This section shall be known as the "Standard Valuation Law."

1. The commissioner shall annually value, or cause to be valued, the reserve liabilities (hereinafter called reserves) for all outstanding life insurance policies and annuity and pure endowment contracts of every life insurance company doing business in this state, except that in the case of an alien company, such valuation shall be limited to its United States business, and may certify the amount of any such reserves, specifying the mortality table or tables, rate or rates of interest and methods (net level premium method or other) used in the calculation of such reserves. In calculating such reserves, he may use group methods and approximate averages for fractions of a year or otherwise. For the purpose of making such valuation the commissioner may employ a competent actuary who shall be paid by the company for which the service is rendered; but a domestic company may make such valuation and it shall be received by the commissioner upon satisfactory proof of its correctness. In lieu of the valuation of the reserves herein required of any foreign or alien company, the commissioner may accept any valuation made, or caused to be made, by the insurance supervisory official of any state or other jurisdiction when such valuation complies with the minimum standard herein provided and if the official of such state or jurisdiction accepts as sufficient and valid for all legal purposes the certificate of valuation of the commissioner when such certificate states the valuation to have been made in a specified manner according to which the aggregate reserves would be at least as large as if they had been computed in the manner prescribed by the law of that state or jurisdiction.

Any such company which at any time shall have adopted any standard of valuation producing greater aggregate reserves than those calculated according to the minimum standard herein provided may, with the approval of the commissioner, adopt any lower standard of valuation, but not lower than the minimum herein provided.

2. This subsection shall apply to only those policies and contracts issued prior to the operative date of section 508.37 (the Standard Nonforfeiture Law).

Except as otherwise provided in subsection 3, paragraphs "f" and "g" for group annuity and pure endowment contracts, the minimum standard of valuation for all policies of domestic life insurance companies shall be the Commissioners Reserve Valuation Method defined in paragraph "b" of subsection 3 and the American Experience Table of Mortality and four and one-half percent interest or the Actuaries' (or Combined) Experience Table of Mortality and four percent interest.

Reserves for all such policies and contracts may be calculated, at the option of the company, according to any standards which produce greater aggregate reserves for all such policies and contracts than the minimum reserves required by this subsection.

3. This subsection shall apply to only those policies and contracts issued on or after the operative date of section 508.37 (the Standard Nonforfeiture Law), except as otherwise provided in paragraphs "f" and "g" for group annuity and pure endowment contracts issued prior to such operative date.

a. Except as otherwise provided in paragraphs "f" and "g", the minimum standard for the valuation of all such policies and contracts shall be the Commissioners Reserve Valuation Method

policies and annuity and pure endowment contracts at minimum standards. The statute provides that these reserves "may be calculated" on a standard which produces a greater aggregate reserve than the minimum reserve. When a standard producing a greater reserve than the minimum has been adopted, the statute requires the company to obtain the permission of the insurance commissioner before reduction or removal of that reserve. The parties specifically stipulated that the additional "reserves" established by petitioner, once created, became subject to the control of the Insurance Department of Iowa, and could not be reduced or discontinued without approval of the insurance commissioner.

Under our holding in *Mutual Benefit Life Insurance Co. v. Commissioner*, 58 T.C. 679, 689–690 (1972), affd. 488 F.2d 1101 (3d Cir. 1973), cert. denied 419 U.S. 882 (1974), petitioner's additional reserves are required by law for purposes of section 801(b)(2). Respondent does not contend that petitioner's addi-

---

defined in paragraph "b" of this subsection 3, three and one-half percent interest or in the case of policies and contracts, other than annuity and pure endowment contracts, issued on or after July 1, 1974 and prior to January 1, 1986, four percent interest, and the following tables:

(1) For all ordinary policies of life insurance issued on the standard basis, excluding any disability and accidental death benefits in such policies,—the Commissioners 1958 Standard Ordinary Mortality Table, provided that for any category of such policies issued on female risks all modified net premiums and present values referred to in this subsection 3 may be calculated according to an age not more than three years younger than the actual age of the insured.

(2) For all industrial life insurance policies issued on the standard basis, excluding any disability and accidental death benefits in such policies,—the 1941 Standard Industrial Mortality Table; provided, however, that the Commissioners 1961 Standard Industrial Mortality Table shall be the table for the minimum standard when said table becomes applicable under the Standard Nonforfeiture Law in accordance with subsection 5 of section 508.37.

(3) For individual annuity and pure endowment contracts, excluding any disability and accidental death benefits in such policies,—the 1937 Standard Annuity Mortality Table or, at the option of the company, the Annuity Mortality Table for 1949, Ultimate, or any modification of either of these tables approved by the commissioner.

\*       \*       \*       \*       \*       \*       \*

c. In no event shall a company's aggregate reserves for all life insurance policies, excluding disability and accidental death benefits, be less than the aggregate reserves calculated in accordance with the method set forth in paragraph "b" above and the mortality table or tables and rate or rates of interest used in calculating nonforfeiture benefits for such policies.

d. Reserves for any category of policies, contracts or benefits as established by the commissioner, may be calculated at the option of the company according to any standards which produce greater aggregate reserves for such category than those calculated according to the minimum standard herein provided. Provided, however, that reserves for participating life insurance policies may, with the consent of the commissioner, be calculated according to a rate of interest lower than the rate of interest used in calculating the nonforfeiture benefits in such policies, with the further proviso that if such lower rate differs from the rate used in the calculation of the nonforfeiture benefits by more than one-half percent the company issuing such policies shall file with the commissioner a plan providing for such equitable increase, if any, in the cash surrender values and nonforfeiture benefits in such policies as the commissioner shall approve.

tional reserves are not "required by law" under our holding in the *Mutual Life* case and the holding in *Lincoln National Life Insurance Co. v. United States,* 582 F.2d 579 (Ct. Cl. 1978), but argues that these cases are incorrectly decided, are contrary to *Union Mutual Life Insurance Co. v. United States,* 570 F.2d 382 (1st Cir. 1978), cert. denied 439 U.S. 821 (1978), and should not be followed.

In our view, the *Union Life* case is distinguishable from the instant case and the *Mutual Life* and *Lincoln Life* cases. *Union Life* involved reserves for the option permitting an insured at stated intervals to obtain additional insurance without a physical examination, and no provision of State law required a reserve for that contingency. In the instant case, the statute required reserves at the minimum rate for life insurance and annuity contracts and permitted such reserves at a higher rate. Once the higher rate was established, it could not be lowered without the permission of the insurance commissioner. Compare *United States v. Consumer Life Insurance Co.,* 430 U.S. 725, 750, 752 (1977).

Respondent contends that even if the additional reserves otherwise meet the "required by law" criterion, they are not life insurance reserves, since, for the years 1964 through 1972, the computations of the additional reserves were erroneous in that the 1959 assumptions were not updated with available current information. Respondent's brief declares that "it would appear almost axiomatic that a reserve based on data other than that relevant to the year in question cannot pass muster."

Section 508.36 of the Iowa Code Annotated (n. 11 *supra*), permits an insurance company to adopt a standard for computing reserves which produces greater aggregate reserves than the minimum standard provided in the statute. The exhibits received in evidence in this case show that the reserves computed by petitioner for the years 1964 through 1972 based on 1959 data are greater than the reserves based on current data. Respondent does not contend that the reserves based on the 1959 data did not meet the requirements of section 508.36 but apparently is contending that they were greater than required under section 508.36. This section, however, provides that a company "may, with the approval of the commissioner, adopt any lower standard of valuation, but not lower than the minimum herein provided." Iowa Code Ann. sec. 508.36, n. 11 *supra*.

The stipulated facts in this record show that petitioner, during the years 1964 through 1972, did not request or obtain the approval of the Insurance Commissioner of Iowa to adopt a standard for computing its additional reserves lower than the standard using the 1959 data.[12] The facts in the *Mutual Life* case show that the reserves there involved were recomputed on updated data. However, our holding in the *Mutual Life* case was not based on that fact, but rather on the fact that any change in the reserves required the approval of the State regulatory agency. In the *Lincoln Life* case, a contention that the additional reserves were excessive was made and rejected by the court (582 F.2d at 586). The factual situation in *United States v. Consumer Life Insurance Co., supra,* differed from that here present. That case involved whether unearned premium reserves with respect to accident and health policies which were the subject of reinsurance contracts should be required in determining whether the taxpayer was a life insurance company within the meaning of section 801. However, in determining that the taxpayer was not required to maintain reserves for the reinsured health and accident policies, the Supreme Court placed great reliance on the acceptance by the State insurance commissioners of the annual reports of the insurance companies reporting reserves as the companies contended they should be reported. In this respect the Court stated (430 U.S. at 749–752):

"Congress was aware of the extensive, continuing supervision of the insurance

---

[12]Pars. 12, 13, and 14 of the stipulated facts are as follows:

"12. Beginning in 1959, petitioner established additional reserves, which it maintained as life insurance reserves, in respect of the annuity guarantees. Petitioner advised the Commissioner of Insurance of the State of Iowa of such action, by letter dated October 28, 1960. On November 14, 1960, petitioner's letter was stamped 'Approved' by the Commissioner of Insurance. A true and correct copy of said letter, as so stamped, is annexed hereto, made a part hereof, and marked as Joint Exhibit 13-M.

"13. The above reserves established by the petitioner, once created, became subject to the control of the Insurance Department of Iowa, and could not be reduced or discontinued without approval of the Insurance Commissioner. From 1959 and throughout the years in issue herein, the petitioner has maintained the additional reserves on its books and records and reported such reserves for each of said years on its annual statement filed with the Insurance Department of Iowa.

"14. In computing the additional reserves for annuity guarantees, petitioner made a study in 1960 based upon 1959 data. The reserve factors resulting from that study were then applied to in-force data in computing or recomputing such reserves for 1960 and subsequent years, including each of the taxable years 1964 to 1972, inclusive. Petitioner did not recompute such factors for each subsequent year (after 1959) on the basis of then current data. Petitioner is presently recomputing such reserves on the basis of updated data for each of the years 1964 through 1972. The parties anticipate reaching agreement as to such computations, and agree that with the approval of the Court, the record may remain open for the purpose of submitting such agreed computations."

industry by the states. It is obvious that subjecting the reserves to the scrutiny of the state regulatory agencies is an additional safeguard against overreaching by the companies." * * * In presenting the 1959 legislation to the full House, members of the committee that drafted the bill were careful to underscore the continuing primacy of state regulation, with specific reference to the question of reserves.

In two of the cases before us the courts below expressly found that the reserves were held in accordance with accepted actuarial and accounting standards, while the third court did not address the issue. In all three, it was found that no state insurance department required any change in the way the taxpayers computed and reported their reserves. * * *

[Fn. refs. omitted.]

*   *   *   *   *   *   *

The insurance departments of the affected States consistently accepted annual reports showing reserves held as the taxpayers claim they should be.[36] It is well established that the consistent construction of a statute "by the agency charged with its enforcement is entitled to great deference by the courts" * * * This is no less the rule when federal courts are interpreting state law administered by state regulatory officials,[37] at least where, as here, there is no reason to think that the state courts would construe the statute differently. * * *

---

[36] In *Consumer Life* and *First Railroad* the Government introduced the testimony of certain insurance department officials from Arizona and Georgia. They indicated that the omission of unearned premium reserves from these two taxpayers' annual reports was permitted "unwittingly" or only because the departments were unfamiliar at the time with these types of reinsurance agreements. But we do not think this after-the-fact testimony from single officials should outweigh the formal, official approval rendered under the names of the commissioners after opportunity for full review. Moreover, this formal approval withstood careful triennial audits. * * *

[37] The relevant Treasury Regulations also seem to make state practice determinative:

"[T]he term 'reserves required by law' means reserves which are required either by express statutory provisions or by rules and regulations of the insurance department of a State, Territory, or the District of Columbia when promulgated in the exercise of a power conferred by statute, *and* which are *reported in the annual statement of the company and accepted by state regulatory authorities* as held for the fulfillment of the claims of policyholders or beneficiaries." Treas. Reg. sec. 1.801–5(b)(1960)(emphasis added.)

See also sec. 1.801–5(a) (indicating that the reserve "must have been actually held during the taxable year for which the reserve is claimed").

The reliance placed on the supervision of insurance companies by State insurance departments in the majority opinion in the *Consumer Life* case was criticized in the dissenting opinion by Mr. Justice White as follows (430 U.S. at 756–757):

II. The majority holds that the taxpayers may obtain these tax savings despite the predominantly nonlife character of their insurance business, "[s]ince the taxpayers neither held the unearned [A&H] premium dollars nor set up the corresponding unearned premium reserves, and since that treatment was in accord with customary practice as policed by the state regulatory authorities . . ." *Ante*, at 750. * * * Under the majority's rule, these reserves held by the third party to cover risks assumed by the A&H company would not

be attributed to that company; its total reserves for purposes of sec. 801 would consist almost entirely of whatever life insurance reserves it held; and the company would satisfy the reserve-ratio test.[4] * * *

___

[4] The majority evidently hopes that state regulatory authorities will prevent "widespread abuse" of this type, *ante*, at 749, by requiring a company assuming insurance risks to hold the corresponding reserves. But, as the Court of Claims below * * * observed, the goal of state insurance regulation is not to protect the federal treasury from tax avoidance by insurance companies doing predominantly nonlife business, but rather to protect policyholders by making sure that funds are set aside out of premium receipts for payment of claims. 207 Ct. Cl., at 645, 524 F. 2d, at 1171. The majority suggests no reason why, as long as the insurer has made some arrangement for the establishment of reserves, the state regulatory authorities will care who holds them.

The majority's hope that the States will prevent insurance companies from taking advantage of the loophole it has created is further undermined by its holding that the A&H reserves involved in these cases were not attributable to the taxpayers under sec. 801(c)(3) as "other insurance reserves required by [state] law." *Ante*, at 750–752. The majority reasons that the taxpayers were not required by state law to maintain these A&H reserves because "[t]he insurance departments of the affected States consistently accepted annual reports showing reserves held as the taxpayers claim they should be." *Ante* at 751. (Footnote omitted.) The majority relies on this failure of state regulatory authorities to require inclusion of the A&H reserves in the taxpayers' annual statements, despite uncontradicted testimony of state insurance officials that the reason for this failure was the state officials' unfamiliarity with these particular arrangements purporting to shift reserves to non-risk-bearing companies. *Ante*, at 751 n. 36. Thus if a company's arrangements for shifting reserve allocations are sufficiently novel, complex, or well disguised in its annual statements to escape detection by state insurance officials, state regulation will not help at all to close the door to widespread federal income tax avoidance.

There is nothing in the Iowa law which requires a continual updating of the assumption on which reserves are based as long as the standard used by an insurance company results in reserves in excess of the reserves computed under the minimum standard. The reserves as computed by petitioner were included in its annual statement and were not questioned by the Iowa Insurance Commissioner even though there were three audits made of petitioner during these years.

In our view, these reserves are "life insurance reserves" which are "required by law" under the rationale of the holding of the Supreme Court in the *Consumer Life Co.* case and under our holding in the *Mutual Life* case. Therefore, we hold these reserves to be life insurance reserves under section 801(b) for the years 1964 through 1972.

Respondent contends that the reserves petitioner maintains with respect to its Equifund B and Equifund C plans fail to qualify as life insurance reserves since (1) they do not meet the requirements of section 801(b)(1)(B) that they be set aside to mature or liquidate claims arising from life insurance or annuity contracts, and (2) they do not meet the requirements of section 801(b)(2) that they be required by law.

Under respondent's regulations, sec. 1.801–5(b), Income Tax

Regs., n. 10 *supra,* the term "reserves required by law" is defined as reserves which are required either by express statutory provisions or by rules and regulations of the insurance department of a State, Territory, or the District of Columbia. In discussing the first issue in this case involving the additional reserves which petitioner maintained with respect to its life insurance contracts that provided an option in the beneficiary or insured to elect annuity payments, we discussed at some length circumstances under which a life insurance reserve is considered to be "required by law." We pointed out that reserves are required by law if established under a State law which either requires or permits such a reserve, if the reserve, once established, cannot be reduced or eliminated without the approval of the State insurance department. Sec. 508.36 of the Iowa Code Ann., n. 11 *supra,* insofar as here applicable, provides for reserves "for all outstanding life insurance policies and annuity and pure endowment contracts of every life insurance company." These are the only reserves provided for by the Iowa insurance laws other than reserves with respect to health and accident and similar types of insurance benefits and group insurance policies, none of which are involved in the present case. Therefore, it is clear that insofar as reserves with respect to life insurance policies and annuity and endowment contracts are concerned, the only reserves provided for or permitted are with respect to "outstanding" policies or contracts.

The facts here show that no actual life insurance policy or annuity or endowment contract was issued to any part-time life insurance salesman of petitioner or to any general agent of petitioner who was not a full-time life insurance salesman because of the participation by the part-time salesmen and general agents in the Equifund B or C plans, until the participant reached retirement age, became disabled, or died. We have set forth provisions of the Equifund B and C plans in detail in our findings. From the portions of these plans we have set forth, it is clear that until such time as a participant under one of these plans retired or became disabled, he had no right in any contribution to the plan made by petitioner, and the only right he had under the plan was for a refund of his own contribution. It is equally clear that no beneficiary of a participant in the Equifund B or C plans had any rights under those plans until the death of the participant or until the

participant retired upon attaining retirement age or became disabled. It is therefore clear that no participant nor beneficiary of a participant obtained any vested rights in the contribution to the plan made by petitioner, or any life insurance policy or annuity or endowment contract until the participant reached retirement age, became disabled, or died.

Respondent has not disallowed reserves with respect to insurance policies or annuity contracts issued to participants or their beneficiaries after the rights of the participant or beneficiary became vested. Therefore, unless we could conclude on the facts here present that the Equifund B and C plans themselves constitute life insurance policies or annuity or endowment contracts, there were no insurance policies or annuity or endowment contracts outstanding with respect to which reserves could properly be maintained for these plans. In our view, clearly, these plans did not constitute life insurance policies, annuity, or endowment contracts. See *Huff v. St. Joseph's Mercy Hospital of Dubuque Corp.*, 261 N.W.2d 695 (Iowa 1978).

Since the Equifund B and C plans were not life insurance policies or annuity or endowment contracts with respect to which reserves were either required or permitted to be established under Iowa law, in our view, petitioner could have discontinued the reserves with respect to these plans which it established, at any time, without consent of the Iowa Insurance Commissioner. The provision that an insurance company which has adopted a standard of valuation producing higher aggregate reserves than those calculated according to the minimum standard provided in section 508.36 of the Iowa Code Annotated is required to obtain the approval of the commissioner to lower or eliminate the reserve has application only to the reserves required to be maintained under that section of the Iowa Code. This statute did not require reserves to be maintained for petitioner's Equifund B and C plans. Petitioner makes much of the fact that its books showed the Equifund B and C reserves and that the examiners from the Iowa Department of Insurance did not question these reserves when examination was made of petitioner's records. The record does not show that petitioner ever sought or obtained permission from the Iowa Insurance Commissioner to establish these reserves. Under the circumstances, the fact that the reserves were not questioned by the examiners of the Iowa Department of Insurance in no way

supports petitioner's contention that these reserves were "required by law." In fact, the better presumption would be that the examiners from the Iowa Department of Insurance concentrated their examination on reserves and other accounting records of petitioner which petitioner was required under Iowa law to maintain.

In order to be life insurance reserves as defined in section 801(b), reserves must be "required by law." Since we have concluded that the reserves maintained by petitioner under its Equifund B and C plans were not "required by law," it is unnecessary for us to consider respondent's contention that these reserves fail to meet the definition of life insurance reserves under section 801(b)(1)(B). However, it should be pointed out that respondent relies for this position primarily on the holding in *Jefferson Standard Life Insurance Co. v. United States*, 408 F.2d 842, 859–860 (4th Cir. 1969), cert. denied 396 U.S. 828 (1969), in which it was held that supplemental retirement plans established by an insurance company for branch office managers, which plans were quite comparable to petitioner's Equifund B and C plans, did not qualify as life insurance reserves under section 801(b)(1)(B).[13] The court, in the *Jefferson Life* case, held that these reserves were not life insurance reserves since treating reserves of a nonqualified pension plan as life insurance reserves was inconsistent with the treatment of qualified pension plan reserves provided for under sections 805(c)(1) and 805(d)(1)(C).[14] The court further held that the

---

[13]The court, in *Jefferson Standard Life Insurance Co. v. United States*, 408 F.2d 842, 859 (4th Cir. 1969), described the plans there involved as follows:

"Taxpayer established a Branch Office Manager's Supplemental Retirement Plan in order to provide supplemental pension benefits to branch office managers. Taxpayer made contributions based upon the employee's salary and such contributions were not set apart or treated as separate funds but remained a part of the general corporate funds of taxpayer. If the employee reached the age of 65 while still in taxpayer's employ he was to receive an annuity. If the employee left taxpayer prior to age 65, died prior to age 65, becomes an agent or employee of another life insurance company at any time, including after retirement, or if taxpayer terminated his employment prior to that age, the employee had no right to any annuity nor to any part of taxpayer's contributions to the plan, irrespective of the number of years the employee belonged to the plan.

"Taxpayer did not issue any actual annuity contracts to branch office managers upon their inclusion in the plan, although it did notify them of their rights under the plan and sent them annual reports of contributions made to the plan in their behalf. Taxpayer expressly reserved an "absolute and unconditional" right to terminate the employment of members of the plan, and also a right to modify or terminate the entire plan. Its right of modification or termination of the plan, however, did not permit it to affect the right of any employee to receive benefits accrued to his account under the plan prior to the effective date of such change or termination."

[14]Sec. 805(c)(1) provided:

forfeiture possibilities under the plans were contrary to the nature of true life insurance reserves.[15]

---

(c) ADJUSTED LIFE INSURANCE RESERVES.—

(1) ADJUSTED LIFE INSURANCE RESERVES DEFINED.—For purposes of this part, the term "adjusted life insurance reserves" means—

(A) the mean of the life insurance reserves (as defined in section 801(b)), other than pension plan reserves, at the beginning and end of the taxable year, multiplied by

(B) that percentage which equals 100 percent—

(i) increased by that percentage which is 10 times the average rate of interest assumed by the taxpayer in calculating such reserves, and

(ii) reduced by that percentage which is 10 times the adjusted reserves rate.

Sec. 805(d)(1)(C) provided:

(d) PENSION PLAN RESERVES.—

(1) PENSION PLAN RESERVES DEFINED.—For purposes of this part, the term "pension plan reserves" means that portion of the life insurance reserves which is allocable to contracts—

*  *  *  *  *  *  *

(C) provided for employees of the life insurance company under a plan which, for the taxable year, meets the requirements of section 401(a)(3), (4), (5), (6), (7), and (8); * * *

[15]The court, in *Jefferson Standard Life Insurance Co. v. United States*, 408 F.2d 842, 859–860 (4th Cir. 1969), stated:

"Section 805(c)(1) defines "adjusted life insurance reserves"—one of the components, the earnings on which form part of the policyholders' share exclusion—as 'other than pension plan reserves.' Section 805(d)(1)(C) provides a special benefit for life insurance companies in that it expressly provides that reserves for pension plans *qualified under sec. 401* may be included as pension plan reserves in computing reserves for purposes of the policyholders' share exclusion, so as to increase the measure of the exclusion. Taxpayer's branch office manager plan is not included in the benefit established by sec. 805(d)(1)(C) since it is not qualified under sec. 401. It is hardly likely that an intelligible legislative purpose would be served in providing that reserves for an insurance company's own pension plan may be recognized in computing the policyholders' share only if the plan qualifies under sec. 401, if the same reserves are to be recognizable in any event as life insurance reserves. This is apparent, even though, as taxpayer argues, the exclusion of 'pension plan reserves' in sec. 805(c)(1) must be read as meaning 'pension plan reserves' for a plan qualified under sec. 401 as sec. 805(d)(1)(C) later defines the term.

"A more basic consideration leading to our affirmance of the district court is the retrievable nature of the alleged pension plan reserves. Taxpayer can invade or take back the amounts it has set aside in divers situations, viz., the resignation of a covered employee before age 65, the death of a covered employee before age 65, and the discharge of a covered employee. Only where rights accrued to his account under the plan prior to the effective date of modification or termination was taxpayer restricted in treatment of the funds set aside; even then, or after retirement, all benefits are forfeited if a branch office manager becomes an employee of any other life insurance company or sells life insurance for another company.

"This restriction, however, is not sufficient to overcome the basic concept of the Act, that only amounts irrevocably put aside to meet certain future obligations to life insurance policyholders, and the earnings thereon necessary to augment the reserves for that purpose, should be rendered tax free. Unlike a true life insurance reserve, unilaterally, taxpayer may terminate the employee relationship and the purported benefit has no cash surrender value. Cf., Helvering v. Inter-Mountain Life Insurance Co., 294 U.S. 686, 55 S.Ct. 572, 79 L.Ed. 1227 (1935); New York Life Ins. Co. v. Bowers, 283 U.S. 242, 51 S.Ct. 399, 75 L.Ed. 1005 (1931); General Life Ins. Co. v. Commissioner, 137 F.2d 185, 189–190 (5 Cir. 1943); Massachusetts Mutual Life Ins. Co. v. United States, 56 F.2d 897, 74 Ct.Cl. 162 (1932). Even if the benefit vests, it is defeasible under certain circumstances. The fact that some pension plans permit the cancellation of benefits under certain circumstances is irrelevant, because taxpayer seeks to sustain its treatment of the amounts set aside, not on the theory that it has a pension plan approved under sec. 401, but on the theory that it has established reserves which are life insurance reserves."

Petitioner recognizes that the facts in the *Jefferson Life* case are indistinguishable from the facts with respect to its reserves under its Equifund B and C plans, but argues that the *Jefferson Life* case was wrongly decided. Petitioner states that section 805(c) pertains only to the formula to be used to calculate the policyholder's investment and has no bearing on the definition of life insurance reserves. Petitioner further argues that section 805(d)(1)(C) was not designed to give recognition to qualified pension plan reserves as life insurance reserves, but to give life insurance reserves with respect to such qualified pension plans preferential treatment.

Petitioner argues that what constitutes life insurance reserves is not a relevant consideration outside the definition of such reserves in section 801(b). Since we have concluded that petitioner's reserves were not required by law within the requirements of section 801(b)(2), it is unnecessary for us to consider the merit of petitioner's arguments with respect to the holding in the *Jefferson Life* case.

*Decision will be entered under Rule 155.*